# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE No.: | 2013AP691 & 2013AP776 |
| COMPLETE TITLE: | Wilson Mutual Insurance Company, |

Wilson Mutual Insurance Company,
　　　　　Plaintiff-Respondent-Petitioner,
　　　v.
Robert Falk and Jane Falk,
　　　　　Defendants-Appellants,
State of Wisconsin Department of Natural
Resources, Lee
Laatsch, Michael Jante, Jessica Jante, Ruth
Hetzel, Jeff
Wiedmeyer, Kimber Wiedmeyer, Paul Lorge, Tammy
Lorge, Paul
Wilkins, Addicus Jante and Trilogy Health
Insurance Inc.,
　　　　　Defendants.
-------------------------------------------------
Wilson Mutual Insurance Company,
　　　　　Plaintiff-Respondent-Petitioner,
　　　v.
Robert Falk, Jane Falk, State of Wisconsin
Department of
Natural Resources, Lee Laatsch, Ruth Hetzel,
Paul Wilkins
and Trilogy Health Insurance, Inc.,
　　　　　Defendants,
Michael Jante, Jessica Jante, Jeff Wiedmeyer,
Kimber Wiedmeyer, Paul Lorge, Tammy Lorge and
Addicus Jante,
　　　　　Defendants-Appellants.

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 352 Wis. 2d 461, 844 N.W.2d 380)
(Ct. App. 2014 – Published)
PDC No.: 2014 WI App 10

| | |
|---|---|
| OPINION FILED: | December 30, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 12, 2014 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Washington |
| JUDGE: | Todd K. Martens |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | BRADLEY, J., concurs. (Opinion filed.) |

DISSENTED:          ABRAHAMSON, C.J., dissents. (Opinion filed.)
NOT PARTICIPATING:  PROSSER, J., did not participate.

ATTORNEYS:

For the plaintiff-respondent-petitioner, there were briefs by *Ryan R. Graff* and *Nash, Spindler, Grimstad & McCracken LLP*, Manitowoc. Oral argument by *Ryan R. Graff*.

For defendants-appellants Robert and Jane Falk, there was a brief by *Ronald R. Ragatz* and *DeWitt Ross & Stevens S.C.*, Madison. Oral argument by *Ronald R. Ragatz*.

For defendants-appellants-respondents *Michael Jante*, *Jessica Jante*, *Addicus Jante*, *Jeff Wiedmeyer*, *Kimber Wiedmeyer*, *Paul Lorge*, and *Tammy Lorge*, there was a brief by *Ryan J. Hetzel* and *Hetzel & Nelson, LLC*, West Bend. Oral argument by *Ryan J. Hetzel*.

An amicus curiae brief was filed by *Laura A. Foggan* and *Wiley Rein LLP*, Washington, D.C.; and *Robert C. Burrell*, *Joshua B. Cronin*, and *Borgelt, Powell, Peterson & Frauen, S.C.*, Milwaukee, on behalf of Complex Insurance Claims Litigation Association.

An amicus curiae brief was filed by *Timothy M. Barber* and *Axley Brynelson LLP*, Madison, on behalf of Wisconsin Insurance Alliance.

2

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   **Error! Reference source not found.**

(L.C. No.  2011CV1448)

STATE OF WISCONSIN          :          IN SUPREME COURT

Wilson Mutual Insurance Company,

       Plaintiff-Respondent-Petitioner,

    v.

Robert Falk and Jane Falk,

       Defendants-Appellants,

State of Wisconsin Department of Natural Resources, Lee

Laatsch, Michael Jante, Jessica Jante, Ruth Hetzel, Jeff

Wiedmeyer, Kimber Wiedmeyer, Paul Lorge, Tammy Lorge, Paul

Wilkins, Addicus Jante and Trilogy Health Insurance Inc.,

       Defendants.

**FILED**

**DEC 30, 2014**

Diane M. Fremgen
Clerk of Supreme Court

--------------------------------------------

Wilson Mutual Insurance Company,

       Plaintiff-Respondent-Petitioner,

    v.

Robert Falk, Jane Falk, State of Wisconsin Department of

**Natural Resources, Lee Laatsch, Ruth Hetzel,
Paul Wilkins**

**and Trilogy Health Insurance, Inc.,**

      **Defendants,**

**Michael Jante, Jessica Jante, Jeff Wiedmeyer,
Kimber**

**Wiedmeyer, Paul Lorge, Tammy Lorge and Addicus
Jante,**

      **Defendants-Appellants.**

---

REVIEW of a decision of the Court of Appeals. *Reversed and cause remanded.*

¶1 MICHAEL J. GABLEMAN, J. We review a published decision of the court of appeals[1] reversing the Washington County circuit court's order granting declaratory judgment in favor of Wilson Mutual Insurance Company ("Wilson Mutual").[2] The circuit court concluded that Wilson Mutual had no duty to defend or indemnify Robert and Jane Falk ("the Falks") against allegations that in 2011 they negligently spread manure[3] on their property

---

[1] Wilson Mut. Ins. Co. v. Falk, 2014 WI App 10, 352 Wis. 2d 461, 844 N.W.2d 380.

[2] The Honorable Todd K. Martens, presiding.

[3] The injured parties further alleged that nitrates and bacteria from the cow manure were also found in their wells.

2

and thereby polluted their neighbors' wells because the Wilson Mutual policy contained an exclusion for pollution.[4]   The court of appeals reversed, concluding that a reasonable farmer would consider cow manure to be "liquid gold" and not a pollutant when applied to a farm field.  Wilson Mut. Ins. Co. v. Falk, 2014 WI App 10, ¶¶1, 3, 352 Wis. 2d 461, 844 N.W.2d 380.

¶2    Three issues are presented for our consideration: 1) whether a pollution exclusion in Wilson Mutual's General Farm Coverage Liability policy excludes coverage for harm caused by the seepage of cow manure into wells; 2) whether the Farm Chemicals Limited Liability Endorsement provides coverage for physical injury to property caused by the seepage of cow manure into wells; and 3) whether the incidental coverages section of Wilson Mutual's General Farm Coverage Liability policy provides indemnity coverage for and a duty to defend against harm caused by the seepage of cow manure into wells.

---

[4] The circuit court concluded Wilson Mutual had no duty to defend or indemnify the Falks because "[a] reasonable person in the position of the Falks would understand cow manure to be waste," and thus the pollution exclusion excluded coverage.  The circuit court further concluded (1) the Farm Chemicals Liability Endorsement did not provide coverage because the endorsement was designed to cover injury to property caused by chemicals, and manure is not a chemical; (2) the endorsement "covers only physical injury to property;" thus, "it would not cover any injures to Addicus Jante" and would not cover "contamination of water in the wells" because the policy excludes coverage from loss of use damages;" and (3) "even if contamination of well water did qualify as physical injury to property" the "costs of clean up, new wells, replacement water, [and] remediation are all the types of costs specially covered by the" exclusion.

¶3    We hold that the pollution exclusion clause in Wilson Mutual's General Farm Coverage Liability policy issued to the Falks unambiguously excludes coverage for well contamination caused by the seepage of cow manure.  First, we conclude that cow manure falls unambiguously within the policy's definition of "pollutants" when it enters a well.  Second, we conclude the Farm Chemicals Limited Liability Endorsement likewise excludes coverage for "physical injury to property" resulting from pollutants.  Finally, we conclude that the "Damage to Property of Others" clause under the incidental coverages section provides incidental coverage up to $500 for each unique well that has allegedly been contaminated by the Falks' manure, and Wilson Mutual has a duty to defend.  Accordingly, the decision of the court of appeals is reversed, and we remand to the circuit court for further proceedings consistent with our holding.

I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

¶4    The Falks are owners and operators of a dairy farm in West Bend, Wisconsin, located in Washington County.  Paul Wilkens, Karen Wilkens, Lee Laatsch, Ruth Hetzel, Michael Jante, Jessica Jante, Addicus Jante, James Wiedmeyer, Kim Wiedmeyer, Paul Lorge, and Tammy Lorge (collectively the "injured parties") are all neighbors of the Falks.

¶5    In early 2011, the Falks spread liquid cow manure onto their farm fields for the purpose of fertilization.  In an attempt to safely apply the manure, the Falks obtained a nutrient management plan prepared by a certified crop agronomist

and approved by the Washington County Land and Water Conservation Department.

¶6 In a letter dated May 23, 2011, the Wisconsin Department of Natural Resources ("DNR") informed the Falks it had received several well contamination complaints from the Falks' neighbors. The DNR investigated the matter and concluded that manure from the Falks' farm leeched into and contaminated wells owned by the injured parties. The contamination made the injured parties' private wells unusable and the water undrinkable. The injured parties alleged that manure, nitrates, and bacteria, including E. coli,[5] seeped into their wells. Additionally, Addicus Jante, a minor, claimed that he contracted bacterium avium[6] from drinking the contaminated water and, as a result, was hospitalized and underwent surgery.

¶7 The DNR used grant money to provide temporary clean water to Laatsch and Hetzel and to replace their wells. The DNR subsequently requested reimbursement from the Falks for these expenses. The Lorges, Jantes, and Wiedmeyers did not qualify

---

[5] "Escherichia coli (abbreviated as E. coli) are a large and diverse group of bacteria. Although most strains of E. coli are harmless, others can make you sick. Some kinds of E. coli can cause diarrhea, while others cause urinary tract infections, respiratory illness and pneumonia, and other illnesses." E. Coli (Escherichia coli), Ctrs. for Disease Control, http://www.cdc.gov/ecoli/ (last visited Oct. 15, 2014) (emphasis omitted).

[6] Bacterium avium is a pulmonary disease. Mycobacterium avium Complex, Ctrs. for Disease Control, (Oct. 12, 2005) http://www.cdc.gov/ncidod/dbmd/diseaseinfo/mycobacteriumavium_t. htm.

for a DNR grant, and had to pay out of pocket.  The Wilkens paid out of pocket to replace their well and do not seek repayment from the Falks.

¶8  Wilson Mutual sold two farmowner policies to the Falks, the first insuring the period from April 10, 2010, to April 10, 2011, and the second insuring the period from April 10, 2011, to April 10, 2012.  The policies were identical in all material respects and we therefore will refer to the policies collectively as "the Wilson Mutual policy."  The Wilson Mutual policy was titled: "Personal Liability Coverage (Farm)" and was designed for owners and operators of farms.

¶9  The Wilson Mutual policy excluded general liability coverage for both "bodily injury" and/or "property damage" "which results from the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of 'pollutants' into or upon land, water, or air."  The policy stated:

> "We" [Wilson Mutual] do not pay for a loss if one or more of the following excluded events apply to the loss, regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded event.
>
>          . . .
>
> l. "bodily injury" or "property damage" which results from the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of "pollutants" into or upon land, water, or air . . .

¶10  "Pollutant" is defined earlier in the policy as: "any solid, liquid, gaseous, thermal, or radioactive irritant or

contaminant, including acids, alkalis, chemicals, fumes, smoke, soot, vapor, and waste.  'Waste' includes materials to be recycled, reclaimed, or reconditioned, as well as disposed of."

¶11  In addition to general liability coverage, the Wilson Mutual policy also included an endorsement for "Farm Chemicals Limited Liability" and an "Incidental Coverages" section.

¶12  The Farm Chemicals Endorsement reads, in relevant part:

> **Farm Chemicals Limited Liability**. "We" pay those sums which an "insured" becomes legally obligated to pay as damages for physical injury to property if:
>
> 1. The injury is caused by the discharge, dispersal, release, or escape of chemicals, liquids, or gases into the air from the "insured premises". The injury must be caused by chemicals, liquids, or gases that the "insured" has used in the normal and usual "farming" operation; and
>
> 2. The chemicals, liquids, or gases have not been discharged, dispersed, or released from an aircraft.
>
>     . . .
>
> Physical injury does not include indirect or consequential damages such as loss of use of soil, animals, crops, or other property or loss of market.
>
> This coverage does not apply to physical injury to property arising out of "farming" operations that are in violation of an ordinance or law.
>
> This coverage does not apply to any loss, cost, or expense arising out of any requests, demands, orders, claims, or suits that the "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, or in any way respond to or assess the effects of pollutants, chemicals, liquids, or gases.

¶13  "Damage to Property of Others" under the incidental coverages section reads, in relevant part:

> 1. Damage to Property of Others—Regardless of an "insured's" legal liability, "we" pay for property of others damaged by an "insured", or "we" repair or replace the property to the extent practical, with property of like kind or quality.  "Our" limit for this coverage is $500 per occurrence.

¶14  On December 5, 2011, Wilson Mutual filed a declaratory judgment motion in the Washington County circuit court against the Falks, the injured parties, and the DNR to determine whether the Wilson Mutual policy covered the manure contamination alleged by the DNR and the injured parties.  On August 29, 2012, Wilson Mutual filed a motion for declaratory judgment claiming it had a duty to neither defend the Falks, nor provide coverage with respect to the injured parties' well contamination.  On October 2, 2012, the Falks filed a motion for summary judgment, arguing that Wilson Mutual had a duty to defend and indemnify the Falks against claims arising from the alleged groundwater contamination.

¶15  On January 23, 2013, the circuit court issued a decision and order granting Wilson Mutual's motion for declaratory judgment, concluding that the Wilson Mutual policy did not provide coverage for the Falks' manure contamination. Based on dictionary definitions of "waste" and "pollutant," the trial court determined that manure is unambiguously a pollutant. The circuit court explained:

> Indeed, [spreading manure] is a form of recycling—one of the actions performed on "waste," a named pollutant

as defined in the Policies. . . . Many substances serve useful purposes in many contexts, yet can be characterized as pollutants in another.  Bleach cleans and disinfects a countertop; yet when poured into a stream it is deadly to the fish living in the water. DDT was an effective pesticide; yet it poisoned raptors who ate rodents exposed to it. . . . A reasonable person in the position of the Falks would understand cow manure to be waste.

¶16 The circuit court also found that the Farm Chemicals Limited Liability Endorsement did not apply because "the Endorsement was designed to cover injury to property caused by chemicals, not manure."  "A reasonable person in the position of the Falks would not have understood cow manure to be a chemical."   Moreover, "the endorsement covers only physical injury to property, so it would not cover any injuries to Addicus Jante."   Likewise, "contamination of the water in the wells does not qualify as physical injury to property, but is instead, 'indirect or consequential damages such as loss of use.'"    Finally, the circuit court concluded "even if contamination of well water did qualify as physical injury to property" the "costs of clean up, new wells, replacement water, [and] remediation are all the types of costs specially covered by the" exclusion.  The circuit court did not address whether the incidental coverages section provided coverage.

¶17 On March 22, 2013, both the Falks and the injured parties appealed this decision.  On December 11, 2013, the court of appeals reversed the circuit court's judgment and concluded that manure was not a pollutant.  <u>Falk</u>, 352 Wis. 2d 461, ¶3. The court of appeals reasoned that precedent required the court

"to 'consider the nature of the substance involved' [in order] to determine whether a pollution exclusion precluded coverage." Id., ¶13 (quoting Langone v. Am. Family Mut. Ins. Co., 2007 WI App 121, ¶17, 300 Wis. 2d 742, 731 N.W.2d 334). The court recognized that, based on the insurance policy's language alone, manure might be a "pollutant" because manure can be both an irritant and a contaminant. Id., ¶10. However, "[the] supreme court has instructed that we must do more than rely on this 'undeniably broad' and 'virtually boundless' language, 'for there is virtually no substance or chemical in existence that would not irritate or damage some person or property.'" Id. (quoting Hirschhorn v. Auto-Owners Ins. Co., 2012 WI 20, ¶30, 338 Wis. 2d 761, 809 N.W.2d 529).

¶18 Accordingly, the court of appeals concluded manure is not a pollutant because manure "has long been a normal and necessary part of the operation of a dairy farm," and to a reasonable farmer manure is "liquid gold." Id., ¶¶1, 15. "Used improperly, both manure and milk can cause irritation or contamination. The fact that milk can cause irritation or contamination in certain circumstances does not equate to a reasonable person defining milk as a 'pollutant.' A reasonable farmer likewise does not see manure as either 'waste' or a 'pollutant.'" Id., ¶3. The court of appeals did not address any other issues because its determination that the Falks' manure is not a pollutant was dispositive. Id., ¶17.

¶19 Wilson Mutual petitioned this court for review, which we granted on April 17, 2014.

10

## II. STANDARD OF REVIEW

¶20 The interpretation of an insurance contract is a question of law that this court reviews independently. Siebert v. Wis. Am. Mut. Ins. Co., 2011 WI 35, ¶28, 333 Wis. 2d 546, 797 N.W.2d 484.

## III. DISCUSSION

¶21 We first consider whether the pollution exclusion contained in the Wilson Mutual policy unambiguously excludes coverage for well contamination caused by the seepage of cow manure, and conclude that it does. We then address whether the Farm Chemicals Limited Liability Endorsement also excludes coverage, and conclude that it does as well. Finally, we examine whether the incidental coverages section provides indemnity coverage and a duty to defend and conclude that it does. We therefore reverse the court of appeals.

A.   The Pollution Exclusion Contained in the Wilson Mutual Policy's General Farm Liability Coverage Excludes Coverage.

¶22 This case requires us to interpret the pollution exclusion clause as it applies to manure and identify whether manure is a pollutant within the meaning of the Wilson Mutual pollution exclusion.

### i.   Applicable Legal Principles

¶23 Our goal in interpreting an insurance policy is to ascertain and carry out the parties' intentions. Id., ¶31. "To that end, we interpret policy language according to its plain and ordinary meaning as understood by a reasonable person in the

11

position of the insured." Hirschhorn, 338 Wis. 2d 761, ¶22 (citations omitted).

¶24 Terms or phrases in an insurance contract are ambiguous only "if they are fairly susceptible to more than one reasonable interpretation." Id., ¶23; Peace ex rel. Lerner v. Nw. Nat'l Ins. Co., 228 Wis. 2d 106, 121, 596 N.W.2d 429 (1999). If policy language is ambiguous, the contract will be narrowly construed against the insurer as its drafter.[7] State Farm Mut. Auto. Ins. Co. v. Langridge, 2004 WI 113, ¶46, 275 Wis. 2d 35, 683 N.W.2d 75. However, an ambiguity exists only where a policy is subject to more than one reasonable interpretation. Id., ¶48. We will not embrace any plausible interpretation created by an insured for the purposes of litigation. Hirschhorn, 338 Wis. 2d 761, ¶23. Similarly, "[t]he mere fact that a word has more than one dictionary meaning, or that the parties disagree about the meaning, does not necessarily make the word ambiguous if the court concludes that only one meaning applies in the context and comports with the parties' objectively reasonable expectations." Ruff v. Graziano, 220 Wis. 2d 513, 524, 583 N.W.2d 185 (Ct. App. 1998) (quoting Sprangers v. Greatway Ins. Co., 182 Wis. 2d 521, 537, 514 N.W.2d 1 (1994)). Likewise, the

---

[7] This is known as the doctrine of contra proferentem. Contra proferentem is Latin for "against the offeror," and means that when "interpreting documents, ambiguities are to be construed unfavorably to the drafter." Black's Law Dictionary 337 (9th ed. 2009); see also Donaldson v. Urban Land Interests, Inc., 211 Wis. 2d 224, 230, 564 N.W.2d 728 (1997).

fact that different courts have come to different conclusions regarding a term in a policy does not render a term ambiguous, or else "only the first interpretation by a court would count." Peace, 228 Wis. 2d at 136.

¶25 Absent a finding of ambiguity, this court will not apply the rules of construction to rewrite the language of an insurance policy to bind an insurer to a risk which it did not contemplate and for which it did not receive a premium. Hirschhorn, 338 Wis. 2d 761, ¶24.  As such, an insurance policy's pollution exclusion clause is ambiguous if a reasonable insured could expect coverage.  Langone, 300 Wis. 2d 742, ¶21.

ii.  The Occurrence for Which the Falks Seek Coverage is the Seepage of Manure into Wells.

¶26 In determining whether coverage exists under an insurance policy, we follow three steps.  First, we must examine the facts of the insured's claim to determine whether the policy makes an initial grant of coverage.  Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 2004 WI 2, ¶24, 268 Wis. 2d 16, 673 N.W.2d 65. The analysis ends there if the policy clearly does not cover the claim.  Id.  Second, if the claim triggers an initial grant of coverage we examine whether any of the policy's exclusions preclude coverage.  Id.  Third, if an exclusion precludes coverage, we analyze exceptions to the exclusion to determine whether any reinstate coverage.  Id.

¶27 Coverage is triggered by an occurrence.  We determine an insurer's duty to defend "by comparing the allegations of the complaint to the terms of the insurance policy."  Estate of

Sustache v. Am. Family Mut. Ins. Co., 2008 WI 87, ¶20, 311 Wis. 2d 548, 751 N.W.2d 845.   In doing so, we focus on the nature rather than the merits of the claim.   Id.   Thus, identifying the occurrence is important because there must be an occurrence under the policy for there to be coverage and the policy's language controls what constitutes an "occurrence." Plastics Eng'g Co. v. Liberty Mut. Ins. Co., 2009 WI 13, ¶30, 315 Wis. 2d 556, 759 N.W.2d 613.

¶28 The Falks do not seek coverage for the over application of cow manure to their farmland.   Rather, the Falks seek coverage for each unique well that has been contaminated. Therefore, the occurrence is not the spreading of manure as fertilizer; rather, there was an occurrence each time a unique well was contaminated by manure.

¶29 The Wilson Mutual policy's General Farm Liability Coverage defined an occurrence as "an accident, including repeated exposures to similar conditions, that results in 'bodily injury' or 'property damage' during the policy period." "Bodily injury" was defined in the policy as "bodily harm to a person and includes sickness, disease, or death."   "Property damage" was defined as "physical injury to tangible property. This includes loss of use."   The Wilson Mutual policy further states "'we' pay, up to 'our' 'limit,' all sums for which an 'insured' is liable by law because of 'bodily injury' or 'property damage' caused by an 'occurrence' to which this coverage applies."   Thus, for there to be an occurrence, there

must be an accident resulting in "bodily injury" or "property damage."

¶30  The Wilson Mutual policy does not define "accident." When a policy does not define a term, we look to the term's common, everyday meaning.  U.S. Fire Ins. Co. v. Ace Baking Co., 164 Wis. 2d 499, 505, 476 N.W.2d 280 (Ct. App. 1991).  The common definition of an "accident" is "'[a]n unexpected, undesirable event' or 'an unforeseen incident' which is characterized by a 'lack of intention.'"  Doyle v. Engelke, 219 Wis. 2d 277, 289, 580 N.W.2d 245 (1998) (quoting The American Heritage Dictionary of the English Language 11 (3d ed. 1992)). The unexpected and undesirable event for which the Falks seek coverage is well contamination.

¶31  The conclusion that the occurrence here is the well contamination is in accord with our precedent.  In Plastics, an insurance policy defined "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."  Plastics, 315 Wis. 2d 556, ¶12.  In Plastics, the insurance company argued that the manufacture and sale of asbestos-containing products without warning constituted one occurrence regardless of the number of people injured by the asbestos.  Id., ¶29.  The insured argued there was an occurrence each time a person was exposed to the asbestos-containing products.  Id.  We held the occurrence was not the manufacture, sale, or installation of the asbestos-containing products.  Id., ¶31.  Rather, we explained there was

15

an occurrence under the policy each time a unique person was exposed to the asbestos because without exposure, no bodily injury could take place.  Id., ¶¶29, 31.

¶32 Wisconsin is in the jurisdictional majority in defining an occurrence as unexpected or unintended resultant damage.[8]  Indeed, Couch on Insurance states that the majority of jurisdictions follow the rule that "[t]here is an occurrence when the insured did not expect or intend the resultant damage." 9 Steven Plitt et al., Couch on Ins. § 127:4 (3d ed. 2008). Here, the accident that resulted in "bodily injury" and "property damage" was the seepage of manure[9] into the neighboring wells.  Seepage into the water supply was neither expected nor

---

[8] E.g., Wakefield Pork, Inc. v. Ram Mut. Ins. Co., 731 N.W.2d 154, 159 (Minn. Ct. App. 2007), review denied, (Aug. 7, 2007) (holding that where a policy defined an occurrence as something unintentional, and the insured clearly did not intend to harm its neighbors or their property by the pig manure odors, which emanated from the insured's farm, the damage from the odors was an "accident" and thus an "occurrence" under the policy).

[9] Manure application can cause excess nitrates to form.  The Environmental Protection Agency ("EPA") has warned that the amount of nitrates in the ground water that result from manure "can reach unhealthy levels.  Infants up to three months of age are particularly susceptible to high nitrate levels and may develop Blue Baby Syndrome (methemoglobinemia), an often fatal blood disorder." What's the Problem?, U.S. Envtl. Prot. Agency, http://epa.gov/region9/animalwaste/problem.html (last updated June 2, 2011) [hereinafter What's the Problem?].  The most common pathogens of concern that can result from livestock manure are E. Coli, campylobacter, salmonella, and cryptosporidium.  U.S. Envtl. Prot. Agency, Literature Review of Contaminants in Livestock and Poultry Manure and Implications for Water Quality 13, 25 (July 2013) [hereinafter Literature Review].

intended.   The Wilson Mutual policy defined an "occurrence" as "an accident, including continuous or repeated exposure to similar conditions, that results in 'bodily injury' or 'property damage' during the policy period."   This language is nearly identical to that in Plastics, and we see no reason why the same analysis should not apply here.   Further, the Falks admit in their brief that they neither "expected nor intended" their manure to get into the groundwater.   In other words, the well contamination was an accident.[10]

¶33  We conclude the Wilson Mutual policy makes an initial grant of coverage because the exposure of manure to each unique well constituted an occurrence under the Wilson Mutual policy. Am. Girl, 268 Wis. 2d 16, ¶24.   Further, as we conclude in subsection C below, five occurrences took place: each time there was "property damage" to a unique well, there was an occurrence.

 iii. The Pollution Exclusion Bars Recovery for Manure in a Well.

¶34  After identifying the five unique occurrences, we must determine whether an exclusion precludes coverage.  Id. ("If the claim triggers the initial grant of coverage in the insuring agreement, we next examine the various exclusions to see whether any of them preclude coverage of the present claim.").   We need to determine only whether manure is a pollutant at the point it entered the injured parties' wells.   The injured parties

---

[10] Had the Falks sought coverage for harm to the fields as a result of manure over-application, then the occurrence would have been over-application on the field.

suffered no harm until the manure seeped into their wells; therefore, the grant of coverage arose at that point. Wilson Mutual argues the General Farm Liability Coverage pollution exclusion precludes coverage. When analyzing whether a pollution exclusion precludes coverage we first must determine whether the substance——in this case manure——is unambiguously a pollutant within the policy's definition. Hirschhorn, 338 Wis. 2d 761, ¶25; Peace, 228 Wis. 2d at 119. We conclude that a reasonable insured would consider manure that seeped into a well to unambiguously be a pollutant.

¶35 Then we must determine whether the alleged loss resulted from the "discharge, release, escape, seepage, migration or dispersal" of the substance under the plain terms of the pollution exclusion clause. Hirschhorn, 338 Wis. 2d 761, ¶25; Peace, 228 Wis. 2d at 119; Donaldson v. Urban Land Interests, Inc., 211 Wis. 2d 224, 229, 564 N.W.2d 728 (1997). The circuit court implicitly found that the alleged loss so resulted when it concluded that "the pollutant exclusion to the Policies applies to the cow manure spread on the Falks' property which allegedly contaminated the aquifer which supplied water to the Defendants." The pollution exclusion could not apply without such a finding. Peace, 228 Wis. 2d at 119; Donaldson, 211 Wis. 2d at 229. None of the parties have contested or appealed this aspect of the circuit court's decision to either this court, or the court of appeals; and as in Preisler v. Gen. Cas. Ins. Co., 2014 WI 135, ¶30, __ Wis. 2d __, __ N.W.2d __, there does not appear to be any dispute that this requirement

18

has been satisfied.[11]   See Waushara Cnty. v. Graf, 166 Wis. 2d 442, 451, 480 N.W.2d 16 (1992) (concluding that arguments not specifically raised on appeal will not be considered or decided).

¶36 As such, the sole disputed issue with regard to the General Farm Liability Coverage pollution exclusion is whether manure is a pollutant.  We conclude that manure is unambiguously a pollutant when it seeps into a well.

¶37 Like many commercial and non-commercial insurance policies, the Wilson Mutual policy's General Farm Liability Coverage had a pollution exclusion.  The pollution exclusion clause excludes from coverage any "bodily injury" or "property damage" which results from the "actual, alleged or threatened discharge, dispersal, seepage, migration, release, or escape of 'pollutants' into or upon land, water, or air."  The policy defines pollutants as "any solid, liquid, gaseous, thermal, or radioactive irritant or contaminant, including acids, alkalis, chemicals, fumes, smoke, soot, vapor, and waste.  Waste includes materials to be recycled, reclaimed, or reconditioned, as well as disposed of."  As such, we must determine whether cow manure falls unambiguously within the definition of "pollutants."

¶38  Whether a substance is a pollutant is evaluated from the standpoint of a reasonable insured.  Our line of pollution exclusion cases reveals that a reasonable insured would consider

---

[11] Further, Wilson Mutual briefed this issue at the circuit court and neither the Falks nor the injured parties responded.

19

a substance to be a pollutant if (1) the substance is largely undesirable and not universally present in the context of the occurrence that the insured seeks coverage for; and (2) a reasonable insured would consider the substance causing the harm involved in the occurrence to be a pollutant.

¶39  When a substance is "universally present and generally harmless in all but the most unusual instances," we have concluded that the substance is not a pollutant.  Donaldson, 211 Wis. 2d at 234.  However, a substance can be a pollutant if the harm is caused by "a unique and largely undesirable substance that is commonly understood to be harmful."  Hirschhorn, 338 Wis. 2d 761, ¶37.

¶40  We most recently analyzed a pollution exclusion in Hirschhorn and concluded that a reasonable insured would view bat guano as a pollutant as guano is undesirable inside a home.[12] Id., ¶¶33, 37.  There, the insureds' vacation home became

---

[12] Though not addressed by this court, this was despite the fact that bat guano can act as a beneficial fertilizer.  See Nikki Phipps, How to Use Bat Guano as a Fertilizer, gardeningknowhow.com, http://www.gardeningknowhow.com/composting/manures/bat-guano-fertilizer.htm (last updated Oct. 31, 2014) ("Bat guano, or feces, has a long history of use as a soil enricher. It is obtained from only fruit and insect-feeding species. Bat dung makes an excellent fertilizer. It's fast-acting, has little odor, and can be worked into the soil prior to planting or during active growth.")  Both bat guano and cow manure can be repurposed for a beneficial use.  Simply because a substance is beneficial in one context does not prevent it from being a pollutant in another.  U.S. Fire Ins. Co. v. Ace Baking Co., 164 Wis. 2d 499, 505, 476 N.W.2d 280 (Ct. App. 1991).

pervaded with bat guano, so much so that the home had to be demolished and rebuilt because of the "penetrating and offensive odor emanating from the home." Id., ¶¶8-10.   The policy at issue defined "pollutant" to include irritants, contaminants, and waste.  Id., ¶5.  We concluded that a reasonable insured would understand bat guano to be a pollutant because bat guano is a unique and largely undesirable substance that is commonly understood to be harmful when released into a home.  Id., ¶37. The harm caused by the bat guano constituted pollution as the bat guano (1) was a contaminant because it made the home "impure [and] unclean;" (2) was an irritant because it could cause "inflammation, soreness, or irritability" in a person's lungs and skin if they were to stay in the home; and (3) was waste because it was a combination of feces and urine that had permeated into the home.[13]   Id., ¶¶33, 34.   Thus, Hirschhorn shows that we must view a substance in the context of the occurrence that the insureds seek coverage for; and in doing so we concluded that, on and in a home, bat guano was a largely undesirable and not universally present substance that a

---

[13] The insureds in Hirschhorn argued that a reasonable insured would not consider bat guano to be waste because the policy, in listing examples of irritants and contaminants, listed industrial pollutants. Hirschhorn v. Auto-Owners Inc. Co., 2012 WI 20, ¶35, 338 Wis. 2d 761, 809 N.W.2d 529. We rejected that argument, explaining that pollution exclusion clauses do not apply to only industrial type pollutants. Id.; Peace ex rel. Lerner v. Nw. Nat'l Ins. Co., 228 Wis. 2d 106, 138-44, 596 N.W.2d 429 (1999).

reasonable insured would unambiguously consider a pollutant. Id., ¶37.

¶41 Similarly, in Peace, we concluded lead paint that had flaked, chipped, and otherwise become dispersed from a wall in a residential rental home was a pollutant. Peace, 228 Wis. 2d at 147-48. We concluded no reasonable insured could view flaked lead paint in a home as anything but a pollutant based upon the multitude of studies indicating the dangerous nature of lead paint.[14] Id. at 147. Indeed, we concluded that when lead paint chips, flakes, or dusts off the walls of a home, it is "widely, if not universally, understood to be dangerous and capable of producing lead poisoning[, as t]he toxic effects of lead have been recognized for centuries." Id. at 137-38. As such, lead paint that has become detached from a wall in a home is dangerous in any quantity. Id. Those flakes, chips, and dust particles are largely undesirable and not universally present in a home, so any harm caused by ingesting or inhaling them is unambiguously pollution. Id.

¶42 In Ace Baking, the court of appeals concluded that linalool in ice cream cones was a pollutant. Ace Baking, 164

---

[14] We concluded the lead paint was a pollutant despite the fact that lead can have a beneficial use when added to paint. See Why Use Lead in Paint?, Royal Soc'y of Chemistry, (Aug. 21, 2007), http://www.rsc.org/chemistryworld/news/2007/August/21080701.asp (explaining that lead is often added to paint to increase the paint's color, opacity, toughness, and protection against water).

Wis. 2d at 505.  In Ace Baking, linalool, a valuable ingredient in fabric softener, contaminated ice cream cones, causing the cones to taste like soap.  Id. at 501.  In response, Ace Baking sought coverage under the insurance policy it purchased from United States Fire.  Id. at 500.  The contamination occurred because the fabric softener and ice cream cones were stored in the same warehouse.  Id. at 501.  The occurrence was the linalool "foul[ing]" Ace Baking's products, as linalool was a unique and harmful foreign substance with respect to ice cream cones.  Id. at 505.  Therefore, Ace Baking analyzed the substance's effect on ice cream cones, not whether linalool was beneficial in a different context.  Id.

¶43 Thus, the prior pollution exclusion cases require us to first analyze whether a substance is largely undesirable and not universally present as to the occurrence for which coverage is sought.  Although manure may not be a pollutant when applied to a farm field, the Falks do not seek coverage for that; rather, they seek coverage for harm done to their neighbors' wells.  In relation to a well, manure is largely undesirable, commonly understood to be harmful, and is not universally present.  See Hirschhorn, 338 Wis. 2d 761, ¶37.

¶44 Despite the contaminating nature of manure, the Falks and injured parties argue that to a reasonable farmer, manure is a universally present, desirable, and generally harmless substance.  While when safely and beneficially applied, manure may be a universally present, desirable, and generally harmless substance on a farm field, this ignores the occurrence for which

23

the Falks seek coverage. In <u>Donaldson</u>, abnormally high carbon dioxide levels were not a pollutant because carbon dioxide is universally present and generally harmless in normal concentrations in an office building. <u>Donaldson</u>, 211 Wis. 2d at 234. A generally benign and common substance like carbon dioxide is not a contaminant because it is "universally present and generally harmless in all but the most unusual instances." <u>Id.</u> Thus, any harm caused by an unusually high concentration of carbon dioxide was not unambiguously pollution. <u>Id.</u> Similarly in <u>Langone</u>, the court of appeals concluded that abnormally high carbon monoxide concentrations in a rental property were not a pollutant because carbon monoxide is an omnipresent substance that people are exposed to on a daily basis. <u>Langone</u>, 300 Wis. 2d 742, ¶26. Thus, any harm caused by an unusually high concentration of carbon monoxide was not unambiguously pollution. <u>Id.</u>

¶45 The same cannot be said for manure. Like bat guano in a home and lead paint chips in a home, manure is a unique and largely undesirable substance commonly understood to be harmful

when present in a well.[15]  A reasonable insured would not view manure as universally present and generally harmless when present in a well.[16]

---

[15] Indeed, a reasonable insured understands the dangerous and polluting nature of manure.  Myriad sources show how dangerous livestock manure can be.  See Wis. Admin. Code NR § 243.01(2) (stating that improperly managed manure can cause groundwater or surface water pollution); U.S. Envtl. Prot. Agency, Literature Review, supra note 9, at 1 (warning that though a resource, livestock manure can "degrade environmental quality, particularly surface and ground water if not managed appropriately. . . . Runoff related to manure is considered a primary contributor to widespread nutrient water quality pollution in the U.S."); U.S. Envtl. Prot. Agency, What's the Problem?, supra note 9 ("When contaminants from animal waste seep into underground sources of drinking water, the amount of nitrate in the ground water supply can reach unhealthy levels"); R.K. Hubbard & R.R. Lowrance, U.S. Dep't of Agric., Management of Dairy Cattle Manure, in Agricultural Utilization of Municipal, Animal and Industrial Wastes, 92, 92 (Robert J. Wright et al. eds., 1998) (warning by the USDA that "surface runoff from dairy feedlots and holding areas have the highest potential to cause water pollution [and] mismanagement in the land application of diary cattle manure has been documented as a cause of water pollution"); Lee Bergquist, Former DNR Regulator Raises Concerns About Runoff From Large Dairy Operations, Milwaukee J. Sentinel, Nov. 29, 2013 http://www.jsonline.com/news/wisconsin/former-dnr-regulator-raises-concerns-about-runoff-from-large-dairy-operations-b99153075z1-233855981.html ("[T]here is a 'general awareness [among farmers] that agriculture is in fact a source of water pollution'").  While manure is certainly beneficial when safely applied, when it ends up in the wrong place, it pollutes.

¶46 After concluding that manure is largely undesirable, commonly understood to be harmful, and not universally present in a well, we next must examine whether a reasonable insured would consider the substance causing the harm involved in the occurrence to be a pollutant.  A substance is not a pollutant merely because it is largely undesirable and not universally present where the occurrence happened.  A pollution exclusion bars coverage for an occurrence only if a reasonable insured would necessarily consider the substance causing the harm involved in the occurrence to be a pollutant under the policy. See Donaldson, 211 Wis. 2d at 232-33; Hirschhorn, 338 Wis. 2d 761, ¶30 ("everyday incidents [should not] be characterized as pollution.").

¶47 For example, a pollution exclusion clause would not bar coverage for harm that results from slipping on the spilled contents of a bottle of Drano.  Donaldson, 211 Wis. 2d at 232 (quoting Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co., 976 F.2d 1037, 1043 (7th Cir. 1992)).  Although Drano may "'cause, under certain conditions, bodily injury or property

---

[16] While it is true that some concentration of nitrates is commonly found in water, Basic Information about Nitrate in Drinking Water, U.S. Envtl. Prot. Agency, http://water.epa.gov/drink/contaminants/basicinformation/nitrate .cfm, (last updated Feb. 5, 2014) [hereinafter Basic Information], a high concentration of nitrates is especially harmful. See Preisler v. Gen. Cas. Ins. Co., 2014 WI 135, ¶46, __ Wis. 2d __, __ N.W.2d __.  Further, according to the DNR, the injured parties were exposed to potentially lethal pollutants, and the Jantes alleged their well was contaminated with E. coli from the manure.

26

damage, one would not ordinarily characterize [slipping on Drano] as pollution.'" Id. (quoting Pipefitters, 976 F.2d at 1043). Further, while Drano may be a unique and largely undesirable substance on a floor, that fact alone does not transform Drano into a pollutant. In other words, in the hypothetical Drano example, the Drano caused harm by causing someone to slip, not by contaminating or irritating someone through pollution. See id. (holding harm caused by inhaling excessive carbon dioxide is not pollution because a reasonable insured would not consider that harm to be pollution).

¶48 The Wilson Mutual policy does not define "irritant, "contaminant," or "waste." In Hirschhorn, a nearly identical pollution exclusion did not define these terms either. Hirschhorn, 338 Wis. 2d 761, ¶28. As such, we looked to definitions used in prior pollution exclusion cases. Id., ¶29. A substance is an irritant if it causes "inflammation, soreness, or irritability of a bodily organ or part." Peace, 228 Wis. 2d at 122 (quoting American Heritage Dictionary, supra, at 954). A substance is a contaminant if it "make[s] [something] impure or unclean by contact or mixture." Id. (quoting American Heritage Dictionary, supra, at 406).

¶49 A reasonable insured may not consider manure safely applied on a field to be a pollutant; however, a reasonable insured would consider manure in a well to be a pollutant. Just because manure may be beneficial when spread on a field, does not mean it is not a pollutant. Manure is a contaminant as it makes water impure or unclean when it comes into contact with or

27

mixes with water.   The injured parties and the DNR allege that the wells were contaminated and polluted by manure, bacteria, and nitrates, requiring the drilling of new wells, as the wells were unusable and the water undrinkable.   See also Preisler, __ Wis. 2d __, ¶46 (explaining large concentrations of nitrates make well water unusable).   Further, as fecal matter, manure fits within the ordinary definition of "waste," and waste is a type of pollutant under the Wilson Mutual policy's General Farm Liability Coverage.   See Hirschhorn, 338 Wis. 2d, ¶¶34-35.   The Falks realize that manure has the potential to contaminate and pollute wells, which is why they filed a nutrient management plan, seeking to safely apply manure.[17]   Therefore, a reasonable insured would consider manure to be a largely undesirable and not universally present substance in a well, and would also consider cow manure to be a pollutant; thus, manure is unambiguously a pollutant under these circumstances.

¶50 The Falks and injured parties further argue that it was the nitrates, not the manure, that caused the harm. However, this argument interprets the pollution exclusion so narrowly that our adoption of it would render the exclusion

---

[17] Wisconsin Admin. Code NR § 151.07(3) requires that farmers who spread manure obtain a nutrient management plan to "limit or reduce the discharge of nutrients to waters of the state."   Washington County further recognizes the dangerousness of improperly stored manure: "[I]mproper management of animal waste storage facilities, including improper land application of stored animal waste, may cause pollution of the ground and surface waters."   Washington County Code Chapter 16.01(3)(b).

28

almost meaningless.  Nitrates of this quantity found in a well could not occur but for excess nitrates that had formed as the result of manure application.  U.S. Envtl. Prot. Agency, Basic Information, supra note 16.  Under a causation analysis, the nitrates could not have seeped into the well, had the manure not been applied.  No one would look at well water contaminated by nitrates and conclude that the well is anything but polluted.  This argument further overlooks the fact that harmful bacteria were also found in the injured parties' wells.  When manure infiltrates a well, it renders the well impure, unclean, and contaminates the water.[18]

---

[18] Our holding that manure found in a well is a pollutant is in accord with other jurisdictions.  The New York Appellate Division held manure in a well was a pollutant.  Space v. Farm Family Mut. Ins. Co., 652 N.Y.S.2d 357 (N.Y. App. Div. 1997). The plaintiffs operated a dairy farm and applied liquid manure to their fields as fertilizer.  Id. at 358.  Their neighbors brought a suit for the alleged contamination of their well due to the over-application of manure.  Id.  The plaintiffs' insurance policy excluded coverage for property damage arising out of the discharge of pollutants. Id.  The plaintiffs argued a natural organic fertilizer that has been purposely and beneficially applied to cropland is not a pollutant.  Id.  The court explained that although the plaintiffs may have been correct that liquid manure is not a "pollutant" when properly applied and confined to cropland, the time and place of the manure's initial discharge or application was not relevant.  Id. The "subsequent leachate of intentionally deposited waste materials" was the occurrence and thus the manure was a pollutant.  Id.  The court explained liquid manure is a pollutant when "the substance has leached into the groundwater and contaminated a well."  Id.  Further, even though the policy was a "special farm package" "ordinary businessmen in the farming community" would understand that "damages resulting from the application of manure to cropland may be excluded from coverage under the policy."  Id.  See also Weber v. IMT Ins. Co., 462 N.W.2d 283, 286 (Iowa 1990) (explaining hog manure that

(continued)

29

¶51 Contrary to the Falks' argument, our holding that manure in a well is a pollutant is in accord with Ace Baking. Ace Baking indicated that things with a beneficial use, like linalool in fabric softener, can be pollutants when found in other items (such as ice cream cones).  Many substances have beneficial uses when properly applied, but can still pollute.

¶52 Finally, the Falks and injured parties argue that the well contamination is the result of an everyday activity gone slightly, but not surprisingly, awry.  Donaldson, 211 Wis. 2d at 233 (explaining that a pollution exclusion should not apply for everyday incidents gone slightly, but not surprisingly, awry); Langone, 300 Wis. 2d 742, ¶19 (explaining that concentrated carbon monoxide levels were a normal condition gone awry). Manure in a well is not an everyday incident gone slightly awry. Like many of the Falks' arguments, this one also focuses on the spreading of manure on to a field, which was not the occurrence. No reasonable insured could characterize manure seepage into a well as anything but pollution.  Viewed in light of the occurrence for which the Falks seek coverage, well contamination is not an everyday activity gone slightly, but not surprisingly,

---

spilled onto a road and contaminated nearby crops was unambiguously "waste material" and a "pollutant" within the meaning of a pollution exclusion); Wakefield Pork, Inc. v. Ram Mut. Ins. Co., 731 N.W.2d 154 (Minn. Ct. App. 2007) (holding that the odor from pig manure was unambiguously a pollutant).

awry.   A reasonable insured would therefore understand manure to be a pollutant.[19]

B.    The Pollution Exclusion in the Farm Chemicals Limited

Liability Endorsement Also Excludes Coverage.

¶53  We must next determine whether the Farm Chemicals Limited Liability Endorsement provides coverage.   We conclude the endorsement does not make an initial grant of coverage for Addicus Jante's bodily injury, and further conclude the well contamination is excluded under this endorsement because the Falks are being asked to respond to the effects of "pollutants."

¶54  As we noted before, "[f]irst, we examine the facts of the insured's claim to determine whether the policy's insuring agreement makes an initial grant of coverage.   If it is clear that the policy was not intended to cover the claim asserted, the analysis ends there."   Am. Girl, 268 Wis. 2d 16, ¶24.   The policy issued by Wilson Mutual contains an endorsement titled "Farm Chemicals Limited Liability."   The endorsement provides coverage and will:

> [P]ay those sums which an "insured" becomes legally
> obligated to pay as damages for physical injury to

---

[19] Typically, our third step is to examine whether the exclusion has an exception: "if a particular exclusion applies, we then look to see whether any exception to that exclusion reinstates coverage.   An exception pertains only to the exclusion clause within which it appears; the applicability of an exception will not create coverage if the insuring agreement precludes it or if a separate exclusion applies."   Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 2004 WI 2, ¶24, 268 Wis. 2d 16, 673 N.W.2d 65.   Because no one argues an exception applies, we need not address it.

property if: 1. The injury is caused by the discharge, dispersal, release, or escape of chemicals, liquids, or gases into the air from the "insured premises". The injury must be caused by chemicals, liquids, or gases that the insured has used in the normal and usual "farming" operations; and 2. The chemicals, liquids, or gases have not been discharged, dispersed, or released from an aircraft. [The endorsement also explains] [t]he physical injury must be caused by an "occurrence" during the policy period.

¶55 The endorsement's plain text covers only "physical injury to property" (emphasis added). Thus, the endorsement does not cover bodily injury to Addicus Jante.

¶56 We then turn to whether there is an initial grant of coverage for the well contamination. First, we examine whether the well contamination is physical injury to property. Wilson Mutual argues the well contamination is loss of use, rather than physical injury to property because the policy states "[p]hysical injury does not include indirect or consequential damages such as loss of use of soil, animals, crops, or other property or loss of market." We are unconvinced and conclude well contamination is physical injury to property. See Soc'y Ins. v. Town of Franklin, 2000 WI App 35, ¶9, 233 Wis. 2d 207, 607 N.W.2d 342 (discussing contamination of property that occurred due to seepage as the physical injury to property); State v. City of Rhinelander, 2003 WI App 87, ¶¶11, 12, 263 Wis. 2d 311, 661 N.W.2d 509 (explaining that where property damage was defined as "'injury to or destruction of tangible property.' . . . Both the on-and off-site [groundwater] contamination are 'property damage'"); Hellenbrand v. Hilliard, 2004 WI App 151, ¶¶33, 35, 275 Wis. 2d 741, 687 N.W.2d 37

(explaining replacement damages are distinct from loss-of-use damages). Therefore, the well contamination is physical injury to property.[20]

¶57 Second, the endorsement covers physical injury to property caused by the seepage of liquids into wells.[21] Wilson Mutual argues that, given the endorsement's title "Farm Chemicals Limited Liability," the endorsement applies only to farm chemicals. Although the endorsement's title does not mention liquids, the text does and controls over the title. See Aiello v. Vill. Of Pleasant Prairie, 206 Wis. 2d 68, 73, 556 N.W.2d 697 (1996) (explaining text controls over title when interpreting a statute). The endorsement's plain text provides coverage for "physical injury to property" caused by "chemicals, liquids, or gases." Thus, the endorsement's plain text covers liquids, which is the form in which the manure was applied, and may trigger an initial grant of coverage.

¶58 However, that does not end the inquiry. "If the claim triggers the initial grant of coverage in the insuring agreement, we next examine the various exclusions to see whether any of them preclude coverage of the present claim." Am. Girl, 268 Wis. 2d 16, ¶24.

---

[20] It is undisputed that the injured parties claim damages, as required by the endorsement.

[21] It is also undisputed that the liquid manure was released into the air from the insured premises using a manure spreader, and that the liquid manure was used in normal and usual farming operations.

¶59 The Farm Chemicals Endorsement does have exclusions, two of which Wilson Mutual contends are applicable. The first exclusion states the coverage does not apply to "physical injury to property arising out of 'farming' operations that are in violation of an ordinance or law." The second provides:

> This coverage does not apply to any loss, cost, or expense arising out of any requests, demands, orders, claims, or suits that the "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, or in any way respond to or assess the effects of pollutants, chemicals, liquids, or gases.

¶60 The endorsement's exclusion barring coverage for a law violation does not apply. Wilson Mutual has not shown that the Falks violated a law, and the Falks correctly argue Wilson Mutual bears the burden of proving that an exclusion applies. Day v. Allstate Indem. Co., 2011 WI 24, ¶26, 332 Wis. 2d 571, 798 N.W.2d 199. Wilson Mutual cites to no authority for the proposition that an unsupported allegation of a violation of law triggers the law-violation exclusion in an insurance policy. See State v. Boyer, 198 Wis. 2d 837, 842 n.4, 543 N.W.2d 562 (Ct. App. 1995) (stating an appellate court will not consider an argument not supported by legal theory).

¶61 However, we conclude that the endorsement's pollution exclusion bars coverage for harm incurred by the contamination of the neighboring wells. Individual terms are not defined under each endorsement, and unlike the term "pollutant" elsewhere in the policy, "pollutant" in the endorsement is not in quotation marks. The policy plainly states: "[r]efer to the

Definitions for words and phrases that have special meaning. These words and phrases are shown in quotation marks or bold type." "Pollutants" in the endorsement is neither in quotation marks or bold type. Thus, we conclude a reasonable insured would not consider the term "pollutant" to have special meaning with regard to the endorsement.

¶62 However, the lack of a definition does not render the term ambiguous. In Ace Baking, "pollutant" was not defined in the policy, even though it was placed inside quotation marks. Ace Baking, 164 Wis. 2d at 502. The court looked to the dictionary definition of "pollutant" and defined a pollutant as "'something that pollutes: a polluting substance, medium, or agent,' and 'pollute' as, inter alia, 'to make physically impure or unclean.'" Id. at 505 (internal citations omitted). This definition of pollutant is substantially similar to the definition of pollutant analyzed above. Thus, our analysis here is the same as above, and we conclude a reasonable insured would consider manure to be a pollutant when found in a well.

¶63 Finally, the exclusion applies because the Falks seek coverage for a loss, cost, and expense, that arose out of requests and demands on behalf of the DNR and the injured parties that the Falks respond to the effects of manure. The words "requests," "claims," and "suits" contradict the Falks' argument that this pollution exclusion applies only to costs incurred as a result of remediation ordered by the government; such requests can come from any person or entity. The phrase "in any way respond to" is also broad enough to include costs to

35

redrill wells and to reimburse the DNR for the grant money and temporary clean water it provided to some of the Falks' neighbors.[22] As such, we conclude that although the endorsement applies to liquids used in farming operations, pollutants cannot find coverage under the Farm Chemicals Limited Liability Endorsement just because they are also liquids.

C.    The Incidental Coverages Section Provides Coverage.

¶64 Finally, we must address whether the incidental coverages section of the Falks' policy provides coverage. We conclude the "Damage to Property of Others" clause under the incidental coverages section requires Wilson Mutual to indemnify the Falks up to $500 for each unique well that was allegedly contaminated by the Falks' manure and that Wilson Mutual has a duty to defend the Falks.

¶65 The "Damage to Property of Others" clause under the incidental coverages section of the Wilson Mutual policy provides that "[r]egardless of an 'insured's' legal liability, 'we' [Wilson Mutual] pay for property of others damaged by an 'insured', or 'we' repair or replace the property, to the extent practical, with property of like kind and quality. 'Our' 'limit' for this coverage is $500 per 'occurrence.'" The incidental coverage section states: "The following coverages are subjected to all the 'terms' of Coverage[] L," but the "Damage

---

[22] The endorsement also does not apply to losses arising out of requests to respond to the effects of liquids. The Falks' liquid manure allegedly contaminated the wells, and as such, even if the manure was not a pollutant, it was a liquid.

to Property of Others" clause further explains, "[t]he exclusions that apply to Coverage[] L . . . do not apply to this coverage." Coverage L provides: "'We' will defend a suit seeking damages if the suit resulted from 'bodily injury' or 'property damage' not excluded under this coverage. 'We' may make investigations and settle claims or suits that 'we' decide are appropriate." The policy further states "'We' do not have to provide a defense after 'we' have paid an amount equal to 'our' 'limit' as a result of a judgment, or after 'our' 'limit' has been tendered for settlement." Wilson Mutual agrees that coverage exists under the "Damage to Property of Others" clause; however, it argues that it is obligated to pay only up to $500 total because there was only one occurrence. Wilson Mutual further argues no duty to defend exists under the incidental coverages section.

¶66 Wisconsin has adopted the "cause theory" to determine the number of occurrences. Plastics, 315 Wis. 2d 556, ¶35. Under the cause theory, "where a single, uninterrupted cause results in all of the injuries and damage, there is but one 'accident' or 'occurrence.'" Welter v. Singer, 126 Wis. 2d 242, 250, 376 N.W.2d 84 (Ct. App. 1985). "If the cause is interrupted or replaced by another cause, the chain of causation is broken and there has been more than one accident or occurrence." Id. (citing Olsen v. Moore, 56 Wis. 2d 340, 349, 202 N.W.2d 236 (1972)). Where the cause and result are "so simultaneous or so closely linked in time and space as to be

considered by the average person as one event," only a single occurrence has taken place.  Id. at 251.

¶67  Because the occurrence under the Wilson Mutual policy is well contamination, not manure application, there was an occurrence each time manure seeped into a unique well.  As such, an "average person" would not consider the well contamination to be one event because manure had to seep into each individual well for the alleged contamination to occur.  Further, because the manure had to seep into each individual well, rather than seep into one well which "fed" the other wells, it cannot be said the seepage was "so simultaneous or so closely linked in time and space as to be considered by the average person as one event."  Id.  Similar to Plastics, where we rejected the argument that the manufacture, sale, and installation of asbestos containing products, without warning, constituted one occurrence, and concluded each individual's repeated exposure to asbestos constituted a unique occurrence, we likewise reject the argument that the spreading of manure constituted one occurrence, and conclude each well's exposure to manure constituted a unique occurrence.

¶68  The "Damage to Property of Others" clause under the incidental coverages section requires Wilson Mutual to indemnify the Falks up to $500 for each well contaminated by the Falks' manure.  Thus, there is a $500 indemnification for each unique well allegedly contaminated by the Falks.

¶69  The incidental coverages section also requires Wilson Mutual defend the Falks.  "The duty of defense depends on the

nature of the claim and has nothing to do with the merits of the claim." Elliott v. Donahue, 169 Wis. 2d 310, 321, 485 N.W.2d 403 (1992). "'The insurer is under an obligation to defend only if it could be held bound to indemnify the insured, assuming that the injured person proved the allegations of the complaint, regardless of the actual outcome of the case.'" Grieb v. Citizens Cas. Co., 33 Wis. 2d 552, 558, 148 N.W.2d 103 (1967) (internal citation omitted). "If there is any doubt about the duty to defend, it must be resolved in favor of the insured." Elliott, 169 Wis. 2d at 321. Where an insurer's policy provides coverage for even one claim made in a lawsuit, that insurer is obligated to defend the entire suit. See Doyle, 219 Wis. 2d at 284-85; Atl. Mut. Ins. Co., v. Badger Med. Supply Co., 191 Wis. 2d 229, 242, 528 N.W.2d 486 (Ct. App. 1995).

¶70 Thus, because the Wilson Mutual policy provides coverage for manure seepage-related claims through the incidental coverages section, Wilson Mutual has a duty to defend the entire suit. However, the Wilson Mutual policy clearly states Wilson Mutual has no duty to provide a defense once it has paid its limit, either because of a judgment, or because of a settlement. Wilson Mutual has the right, under the policy, to settle. While we take no position on whether Wilson Mutual should settle, if Wilson Mutual decides to settle each claim for $500, the policy language plainly states its duty to defend is complete, as no other policy provision would indemnify the Falks.

IV. CONCLUSION

¶71 We hold that the pollution exclusion clause in Wilson Mutual's General Farm Coverage Liability policy issued to the Falks unambiguously excludes coverage for well contamination caused by the seepage of cow manure. First, we conclude that cow manure falls unambiguously within the policy's definition of "pollutants" when it enters a well. Second, we conclude the Farm Chemicals Limited Liability Endorsement likewise excludes coverage for "physical injury to property" resulting from pollutants. Finally, we conclude that the "Damage to Property of Others" clause under the incidental coverages section provides incidental coverage up to $500 for each unique well that has allegedly been contaminated by the Falks' manure, and Wilson Mutual has a duty to defend. Accordingly, the decision of the court of appeals is reversed and we remand to the circuit court for further proceedings consistent with our holding.

*By the Court.*–The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶72 DAVID T. PROSSER, J., did not participate.

¶73 ANN WALSH BRADLEY, J. (*concurring*). I agree with the majority that "Wisconsin is in the jurisdictional majority in defining an occurrence as unexpected or unintended resultant damage." Majority op., ¶32. I further agree with the application of that definition. Id., ¶¶33-34.

¶74 We part ways, however, when the majority strays from its original occurrence analysis and inconsistently states that "Wisconsin has adopted a 'cause theory.'" Id., ¶66. Additionally, for the reasons set forth in the dissent, I do not agree with the majority's interpretation of the Farm Chemicals Limited Liability Endorsement. Dissent, ¶131. Accordingly, I respectfully concur.

¶75 SHIRLEY S. ABRAHAMSON, C.J. *(dissenting).* I would affirm the decision of the court of appeals.

¶76 This case requires us to interpret a standard pollution exclusion clause in the insurance policy titled "FARMOWNERS policy" issued to Robert and Jane Falk. The issue is whether cow manure that the Falks spread over their land that caused damage to nearby wells is a "pollutant" under the pollution exclusion clause in their FARMOWNERS policy.

¶77 If the pollution exclusion clause bars coverage, then the court must interpret two other policy provisions: the incidental coverages section and the Farm Chemicals Limited Liability Endorsement.

¶78 The extent of Wilson Mutual's liability under the incidental coverages section depends on how many "occurrences" there were.

¶79 Whether Wilson Mutual is liable under the Farm Chemicals Limited Liability Endorsement depends on whether the endorsement's remediation exclusion is applicable.

¶80 The majority opinion concludes that "manure is unambiguously a pollutant when it seeps into a well."[1] The majority opinion's approach to this issue unnecessarily departs from precedent, undercuts the limiting principles our prior cases have applied, and further confuses this murky area of the law.

_____

[1] Majority op., ¶36.

1

¶81 The majority opinion further concludes that the Falks are covered under the incidental coverages section, which obligates Wilson Mutual to pay $500 per occurrence. The majority opinion determines that there were "five unique occurrences" in this case: "[E]ach time there was 'property damage' to a unique well, there was an occurrence."[2] In discussing the number of occurrences, the majority opinion contradicts itself and assumes facts not established in the summary judgment record.

¶82 Furthermore, the majority opinion's discussions of what constitutes an occurrence and of whether a substance is a pollutant are inconsistent with the court's approach to those issues in Preisler v. General Casualty Insurance Co., 2014 WI 135, ___ Wis. 2d ___, ___ N.W.2d ___, mandated on this same date. I write on substantially similar issues in my dissent in Preisler. My dissents in Preisler and in the instant case should be read together.

¶83 Finally, the majority opinion determines that coverage is barred under an exclusion within the Farm Chemicals Limited Liability Endorsement. This interpretation of the exclusion renders the endorsement illusory and superfluous.

¶84 I conclude that a reasonable person in the position of the Falks, farmers insured under a FARMOWNERS policy, would not consider manure a pollutant under the policy's pollution exclusion clause. Thus, I would not bar coverage.

_____

[2] Id., ¶33, 34.

2

¶85 If the majority is unwilling to adhere to our longstanding practice of honoring the expectations of the reasonable insured, then I would remand the cause to the circuit court so the parties can produce evidence regarding the Falks' expectations of coverage and the objective reasonableness of those expectations. Summary judgment should not be granted before the parties have that opportunity.

¶86 If coverage is barred by the pollution exclusion clause, I would find coverage under both the incidental coverages section and the endorsement.

¶87 Accordingly, I dissent.

I

¶88 Robert and Jane Falk, the insureds in this case, are dairy farmers. They own roughly 600 head of cattle and more than 1,670 acres of land. Like countless other dairy farmers in this state, the Falks fertilize their fields with liquid manure from their dairy cows. Farmers must spread manure to ensure the success of their crops, which are their livelihood. Manure is "universally present and generally harmless" on farmland.[3]

¶89 In early 2011, the Falks spread liquid manure on their farm as they had done in previous years. Shortly thereafter, the Falks' neighbors discovered that manure had contaminated their wells. The Department of Natural Resources confirmed that manure spread by the Falks had seeped into five neighbors' wells, contaminating the water.

_____

[3] See Donaldson v. Urban Land Interests, Inc., 211 Wis. 2d 224, 234, 564 N.W.2d 728 (1997).

3

¶90 During this time, the Falks were insured under a FARMOWNERS policy issued by Wilson Mutual. Wilson Mutual contends that manure is a "pollutant" and thus that coverage for this incident is barred by the policy's pollution exclusion clause. The Falks argue that manure is not a pollutant and thus that the FARMOWNERS policy should cover their liability for the well contamination.

II

¶91 The following principles govern the court's interpretation of the insurance policy provisions at issue, as they govern interpretation of all insurance contract provisions.[4]

- Words and phrases in insurance contracts are subject to the same rules of construction that apply to contracts generally.

- The primary objective in interpreting and construing a contract is to ascertain and carry out the true intent of the parties.

- If the language of an insurance policy is unambiguous, a court will not rewrite the policy by construction and will interpret the policy according to its plain and ordinary meaning to avoid imposing contract obligations that the parties did not undertake.

- Words and phrases in an insurance policy are ambiguous when they are so imprecise and elastic as to lack any certain interpretation or are susceptible to more than

---

[4] See Frost ex rel. Anderson v. Whitbeck, 2002 WI 129, ¶¶15-22, 257 Wis. 2d 80, 654 N.W.2d 225.

4

one reasonable construction. Terms of an insurance policy may be inherently ambiguous or may be ambiguous when considered in the context of the insurance policy as a whole. Whether ambiguity exists in an insurance policy is a question of law.

- Ambiguous terms are to be construed against the insurance company that drafted the policy. Ambiguous terms are to be construed in favor of coverage, and exclusions are to be narrowly construed against the insurance company.

- Language in an insurance policy is construed as understood by a reasonable person in the position of the insured rather than as intended by the insurance company. The insured's reasonable expectations of coverage should be furthered by the interpretation given.

- Furthermore, in construing an insurance policy as it is understood by a reasonable person in the position of the insured, a court may consider the purpose or subject matter of the insurance contract, the situation of the parties, and the circumstances surrounding the creation of the contract.

- A construction of an insurance policy that gives reasonable meaning to every provision of the policy is preferable to one leaving part of the language useless or meaningless.

5

¶92 I now apply these interpretive principles to the three policy provisions at issue.

III

¶93 I begin with the pollution exclusion clause.

¶94 The "Personal Liability Coverage (Farm)" section of the Falks' FARMOWNERS policy includes the following exclusion:

> "We" do not pay for a loss if one or more of the following excluded events apply to the loss, regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded event.
>
> . . . .
>
> l. "bodily injury" or "property damage" which results from the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of "pollutants" into or upon land, water, or air.

¶95 The policy defines "pollutant" as "any solid, liquid, gaseous, thermal, or radioactive irritant or contaminant, including acids, alkalis, chemicals, fumes, smoke, soot, vapor and waste. Waste includes materials to be recycled, reclaimed, or reconditioned, as well as disposed of."

¶96 Pollution exclusion clauses present a particular interpretive challenge, as this court has acknowledged.[5] The

---

[5] In some cases, courts have viewed similarly worded pollution exclusion clauses ambiguous and thus have not barred recovery. See, e.g., Donaldson, 211 Wis. 2d at 235 (the insurance policy's definition of "pollutant" was ambiguous; thus, the landlord insured could recover for damage caused by carbon dioxide).

(continued)

6

language of a standard pollution exclusion clause is "virtually boundless, for there is virtually no substance or chemical in existence that would not irritate or damage some person or property."[6] Thus, this court has concluded that "[w]ithout some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results."[7]

¶97 Because the court construes insurance policy provisions as would a reasonable insured, this court has held that pollution exclusion clauses do not bar coverage when "injuries result[] from everyday activities gone slightly, but not surprisingly, awry."[8]

¶98 To dairy farmers like the Falks, spreading manure is indisputably an everyday activity. Manure is a substance with which the Falks routinely work in the course of their ordinary farming operations.

---

In other cases, courts have viewed similarly worded pollution exclusion clauses as unambiguous and barred recovery. See, e.g., Hirschhorn v. Auto-Owners Ins. Co., 2012 WI 20, ¶47, 338 Wis. 2d 761, 809 N.W.2d 529 (bat guano unambiguously falls within the policy's definition of "pollutants," thereby precluding coverage); Peace ex rel. Lerner v. N.W. Nat'l Ins. Co., 228 Wis. 2d 106, 136, 596 N.W.2d 429 (1999) (the policy's definition of "pollutant" was unambiguous, lead paint was a pollutant, and coverage was properly denied).

[6] Donaldson, 211 Wis. 2d at 232 (quoting Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co., 976 F.2d 1037, 1043 (7th Cir. 1992)).

[7] Donaldson, 211 Wis. 2d at 232 (quoting Pipefitters, 976 F.2d at 1043).

[8] See Donaldson, 211 Wis. 2d at 233.

7

¶99 In addition, farmers like the Falks apply manure to their land precisely in order to have it seep into the soil. Seepage is the whole point. Seepage into neighbors' wells, the injury in the present case, thus resulted from an everyday activity "gone slightly, but not surprisingly, awry."[9]

¶100 A court keeps the underlying purpose and subject matter of the insurance in mind when construing policy provisions. The Falks purchased this FARMOWNERS policy to cover their liability for injury to the person or property of others caused by their farming operations. A reasonable insured would not consider manure a pollutant under a FARMOWNERS policy it purchased specifically to cover its liability for injury to the person or property of others caused by farming operations. Rather, as the court of appeals put it, a reasonable insured in the position of the Falks would view manure as "liquid gold."[10]

¶101 A pollution exclusion clause is ambiguous when the insured could reasonably expect coverage under the facts of the case.[11] The FARMOWNERS policy's failure to identify manure specifically as a pollutant made the pollution exclusion clause ambiguous in the context of this FARMOWNERS policy. Ambiguous clauses are construed against the insurance company. Thus, the

[9] Id.

[10] Wilson Mut. Ins. Co. v. Falk, 2014 WI App 10, ¶15, 352 Wis. 2d 461, 844 N.W.2d 380.

[11] Donaldson, 211 Wis. 2d at 233.

pollution exclusion clause should be construed against the insurance company.[12]

¶102 In sum, I conclude that a reasonable insured in the position of the Falks would expect coverage under their FARMOWNERS policy for damage caused by manure that they spread as fertilizer on their farmland. The insured's reasonable expectations of coverage must be honored. Thus, I conclude that the pollution exclusion clause does not bar coverage in the present case.

¶103 Many cases in other jurisdictions similarly limit the scope of pollution exclusion clauses by adhering to the reasonable insured's expectations of coverage. See, for example, the following cases:

- Meridian Mut. Ins. Co. v. Kellman, 197 F.3d 1178, 1183 (6th Cir. 1999) (reasonable person in the position of insured construction contractor would expect coverage for injuries suffered by employee who breathed fumes from chemicals the contractor sprayed a few feet away despite pollution exclusion clause in construction contractor's insurance policy);

- Reg'l Bank of Colo., N.A. v. St. Paul Fire & Marine Ins. Co., 35 F.3d 494, 498 (10th Cir. 1994) (insured landlord would not characterize carbon monoxide

---

[12] For cases using similar reasoning, see W. Alliance Ins. Co. v. Gill, 686 N.E.2d 997 (Mass. 1997) (reasonable insured restaurant owner would expect coverage for patron's carbon monoxide poisoning, which was caused by a defective oven, despite pollution exclusion); Hocker Oil Co. v. Barker-Phillips-Jackson, Inc., 997 S.W.2d 510, 518 (Mo. Ct. App. 1999) (reasonable person in the position of insured gasoline transporting company would not consider gasoline that spilled a pollutant).

emitted from a malfunctioning residential heater as "pollution");

- W. Alliance Ins. Co. v. Gill, 686 N.E.2d 997 (Mass. 1997) (reasonable insured restaurant owner would expect coverage for patron's carbon monoxide poisoning, which was caused by a defective oven, despite the pollution exclusion);

- Hocker Oil Co. v. Barker-Phillips-Jackson, Inc., 997 S.W.2d 510, 518 (Mo. Ct. App. 1999) (reasonable person in the position of insured gasoline transporting company would not consider gasoline a pollutant);

- Island Assocs., Inc. v. Eric Grp., Inc., 894 F. Supp. 200, 203 (W.D. Pa. 1995) (reasonable person in the position of insured asbestos abatement subcontractor would not consider cleaning supply fumes pollutants);

- Langone v. Am. Family Mut. Ins. Co., 2007 WI App 121, ¶28, 300 Wis. 2d 742, 731 N.W.2d 334 (reasonable person in the position of insured landlord would expect coverage for tenant's death caused by carbon monoxide poisoning from a poorly installed boiler despite pollution exclusion clause in landlord's insurance policy).

¶104 The majority opinion fails to adhere to the longstanding practice in this and many other courts of honoring the expectations of the reasonable insured in interpreting a pollution exclusion clause.

¶105 The majority's interpretation of the pollution exclusion clause is unpersuasive. It sets forth the following test for whether a substance is a pollutant:

Whether a substance is a pollutant is evaluated from the standpoint of a reasonable insured. Our line of pollution exclusion cases reveals that a reasonable insured would consider a substance to be a pollutant if (1) the substance is largely undesirable and not universally present in the context of the occurrence that the insured seeks coverage for; and (2) a reasonable insured would consider the substance

10

causing the harm involved in the occurrence to be a pollutant.[13]

¶106 Despite the majority opinion's claim that this test is grounded in precedent, in fact it sharply diverges from precedent. Part (1) of the test takes a far narrower view of what constitutes a pollutant than the court has taken in past cases. Part (2) of the test simply restates the premise that we construe the pollution exclusion clause from the perspective of the reasonable insured.

¶107 Regarding part (1) of its test, the majority opinion concludes that "[w]hile when safely and beneficially applied, manure may be a universally present, desirable, and generally harmless substance,"[14] it is nevertheless a "largely undesirable substance commonly understood to be harmful when present in a well."[15]

¶108 Regarding part (2) of its test, the majority concludes that "[a] reasonable insured would consider manure in a well to be a pollutant."[16] Who wouldn't?

¶109 The essence of the majority's analysis is that manure is a pollutant when it pollutes. Using this reasoning, every substance that pollutes is a pollutant. This reasoning simply begs the question.

---

[13] Majority op., ¶38.

[14] Id., ¶44.

[15] Id., ¶45.

[16] Id., ¶49 (emphasis in original).

11

¶110 The point this court has made again and again in cases involving pollution exclusion clauses is that "there is virtually no substance or chemical in existence that would not irritate or damage some person or property."[17] Thus, "[t]he reach of the pollution exclusion clause must be circumscribed by reasonableness, lest the contractual promise of coverage be reduced to a dead letter."[18]

¶111 By contending that at the moment the substance contaminates it becomes a pollutant under the policy, the majority opinion allows the pollution exclusion clause to extend far beyond the limited scope we have permitted in prior cases, leading to absurd results.

¶112 If the majority is unwilling to apply our general rules for interpreting insurance policies, which honor the expectations of the reasonable insured, then the majority should remand the case to the circuit court to allow the parties to develop a factual record regarding the reasonable expectations of the insured.

¶113 The parties are here on summary judgment. The Falks contend that they expected coverage. It is unclear what representations Wilson Mutual may have made to the Falks about their coverage. Summary judgment is inappropriate when the Falks have not had a chance to prove their expectations and the

---

[17] Donaldson, 211 Wis. 2d at 232 (quoting Pipefitters, 976 F.2d at 1043).

[18] Donaldson, 211 Wis. 2d at 233.

12

objective reasonableness of those expectations. Remanding the matter would conform to prior cases that have explored the subjective expectations of the insured.

IV

¶114 Because the majority opinion concludes that coverage is barred under the pollution exclusion clause, it considers whether the incidental coverages section provides some lesser coverage. This section of the FARMOWNERS policy states in relevant part:

> The following coverages . . . do not increase the "limits" stated for the Principal Coverages.
>
> 1. Damage to Property of Others – Regardless of an "insured's" legal liability, "we" pay for property of others damaged by an "insured", or "we" repair or replace the property, to the extent practical, with property of the like kind and quality. "Our" "limit" for this coverage is $500 per "occurrence."

(Emphasis added.)

¶115 In my view, the incidental coverages section is not an issue in the present case because the pollution exclusion clause does not bar coverage under the principal coverages section. If the pollution exclusion bars coverage, I agree that the Falks can recover $500 per occurrence under the incidental coverages section. I disagree, however, with the majority opinion's approach to determining the number of occurrences.

¶116 The majority correctly notes the policy's definition of "occurrence" ("an accident, including repeated exposures to similar conditions, that results in 'bodily injury' or 'property damage' during the policy period"), but its application of that definition is problematic for at least two reasons.

13

¶117 First, the majority opinion contradicts itself.

¶118 The majority opinion initially states that "Wisconsin is in the jurisdictional majority in defining an occurrence as unexpected or unintended resultant damage."[19] The majority opinion then concludes that "the exposure of manure to each well constituted an occurrence"[20] because the damage in this case was "seepage of manure into the neighboring wells."[21]

¶119 Later on, the majority opinion states that "Wisconsin has adopted the 'cause theory,'" which holds that "where a single, uninterrupted cause results in all of the injuries and damage, there is but one accident or occurrence."[22]

---

[19] Majority op., ¶32.

[20] Id., ¶33.

[21] Id., ¶32.

[22] Majority op., ¶66 (citing Plastics Eng'g Co. v. Liberty Mut. Ins. Co., 2009 WI 13, ¶67, 315 Wis. 2d 556, 759 N.W.2d 613; quoting Welter v. Singer, 126 Wis. 2d 242, 250, 376 N.W.2d 84).

Plastics Engineering, 315 Wis. 2d 556, ¶38, states:

The general rule is that an occurrence is determined by the cause or causes of the resulting injury. . . .

The fact that there were multiple injuries and that they were of different magnitudes and that injuries extended over a period of time does not alter our conclusion that there was a single occurrence. As long as the injuries stem from one proximate cause, there is a single occurrence.

(Quoting Welter, 126 Wis. 2d at 250-51).

¶120 Was the cause of the damage or the damage itself the occurrence in this case? The majority opinion does not provide a clear answer to this question.

¶121 The majority opinion's discussion of "occurrence" is inconsistent with the discussion of occurrence in the majority opinion in Preisler v. General Casualty Insurance Co., 2014 WI 135, ¶¶24-28, ___ Wis. 2d ___, ___ N.W.2d ___. In her concurring opinion in Preisler, Justice Bradley persuasively explains that the majority opinion's discussion of occurrence in Preisler is unnecessary, internally contradictory,[23] and inconsistent with the instant case. I join Justice Bradley's criticisms of the discussion of occurrence in Preisler. These criticisms apply to the majority opinion in the instant case, as well.

¶122 Second, the majority opinion assumes facts not established in the summary judgment record.

¶123 The majority opinion determines there were five occurrences in this case because five wells were contaminated. It appears to assume that manure seeped into each well just once, and thus that there was only one cause or incidence of damage per well. The record does not support this conclusion. The majority opinion overlooks the fact that a single piece of

---

[23] "It is unclear whether the majority is embarking on a cause approach or damage approach in determining what constitutes an occurrence." Preisler v. Gen. Cas. Ins. Co., 2014 WI 135, ¶___, ___ Wis. 2d ___, ___ N.W.2d ___ (Bradley, J., concurring).

15

property can be damaged multiple times and that there can be different causes for each incidence of damage.

¶124 The majority opinion further overlooks the ambiguity in the record regarding what the "accident" was. It concludes the accident was seepage of manure into the well. However, if the Falks over-applied or otherwise misapplied manure to their farmland, the accident might instead be considered that misapplication. If the accident was the Falks' misapplication of manure to their farmland, then there may have been just one occurrence in this case. The record does not reveal how many times the Falks fertilized their land in early 2011 or whether it was one particular application of fertilizer, or the cumulative effect of multiple applications over a period of time, that caused manure to seep into their neighbors' wells.

¶125 These are fact questions that the summary judgment record does not resolve. Summary judgment should not be granted on this issue before the parties have the opportunity to further develop the factual record.

V

¶126 I turn to the Farm Chemicals Limited Liability Endorsement. The endorsement states in relevant part:

"We" pay those sums which an "insured" becomes legally obligated to pay as damages for physical injury to property if:

1. The injury is caused by the discharge, dispersal, release, or escape of chemicals, liquids, or gases into the air from the "insured premises". The injury must be caused by chemicals, liquids, or gases that the "insured" has used in the normal and usual "farming" operations[.]

16

¶127 The endorsement includes various exclusions, as well. The exclusion relevant here is as follows:

> This coverage does not apply to any loss, cost, or expense arising out of any requests, demands, orders, claims, or suits that the "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, or in any way respond to or assess the effects of pollutants, chemicals, liquids, or gases.

¶128 On its face, this exclusion can be read to negate all coverage provided by the endorsement, rendering the endorsement useless.

¶129 The endorsement first states that Wilson Mutual will pay "damages for physical injury to property . . . caused by the discharge, dispersal, release, or escape of chemicals, liquids, or gases into the air . . . ." The endorsement then excludes from coverage "any loss, cost, or expense arising out of any requests . . . or suits that the 'insured' or others . . . in any way respond to or assess the effects of pollutants, chemicals, liquids, or gases."

¶130 Manure used as fertilizer is indisputably a liquid. If a lawsuit against the Falks seeking money damages constitutes a "suit that the 'insured' . . . in any way respond to . . . the effects of" manure, then the endorsement provides no coverage at all.

¶131 The majority opinion adopts this literal interpretation, concluding that "well contamination is excluded under this endorsement because the Falks are being asked to

17

respond to the effects of 'pollutants.'"[24]  The majority opinion violates the rule that "[a] construction of an insurance policy that gives reasonable meaning to every provision of the policy is preferable to one leaving part of the language useless or meaningless."[25]  The majority opinion also ignores the principles that "ambiguous terms are to be construed in favor of coverage" and that "exclusions are to be narrowly construed against an insurer."[26]

¶132 Although the text of the endorsement could be clearer, a careful reading of the text and a review of case law shows that the exclusion at issue bars coverage only when the insured has been ordered to undertake remediation.[27]  The exclusion does not bar coverage when, as in the instant case, the claimants seek to recover money damages.[28]  By overlooking this distinction, the majority opinion renders the endorsement illusory and mere surplusage.

¶133 In sum, I conclude that a reasonable person in the position of the Falks, insured farmers, would not consider

---

[24] Majority op., ¶53.

[25] Frost, 257 Wis. 2d 80, ¶21.

[26] Id., ¶19.

[27] See Gen. Cas. Co. of Wis. v. Hills, 209 Wis. 2d 167, 180, 561 N.W.2d 718 (1997) (when parties other than the EPA and DNR sought compensatory monetary damages for past injuries insured allegedly inflicted, suit was brought against insured for damages under the policy).

[28] Hills, 209 Wis. 2d at 185.

manure a pollutant under the pollution exclusion clause of the FARMOWNERS policy. Thus, I would not bar coverage.

¶134 If the majority is unwilling to adhere to this court's longstanding practice of honoring the expectations of the reasonable insured, then I would remand the cause to the circuit court so the parties can produce evidence regarding the Falks' expectations of coverage and the objective reasonableness of those expectations. Summary judgment should not be granted before the parties have that opportunity.

¶135 If coverage is barred by the pollution exclusion clause, coverage is available to the Falks under both the incidental coverages section and the endorsement. However, because there are insufficient facts in the summary judgment record to determine what the occurrence was or what the number of occurrences were in this case, I would leave that issue for the circuit court to decide after further development of the factual record.

¶136 In conclusion, I note that on the same day the court heard argument on the instant case, it heard argument on another case involving damage caused by septage and a substantially similar pollution exclusion clause. See Preisler v. Gen. Cas. Ins. Co., 2014 WI 135, ___ Wis. 2d ___, ___ N.W.2d ___. As a result of our new procedure for opinion preparation and mandate, Preisler and Wilson Mutual were on different orbits of circulation with different deadlines, there was no conference to discuss the draft opinions, and it was difficult to make the two opinions consistent. Even upon their release, the opinions

19

remain inconsistent. The core function of courts is, of course, consistent and reliable application of the law. I set forth the new procedure for opinion preparation and mandate in full in my concurring opinion in State v. Gonzalez, 2014 WI 124, ¶¶25-40, ___ Wis. 2d ___. ___ N.W.2d ___ (Abrahamson, C.J., concurring).

¶137 For the reasons set forth, I dissent.