Patrick J. CONNORS, Plaintiff-Appellant,

v.

ZURICH AMERICAN INSURANCE COMPANY, Grede Foundries Health Plan By Its Third Party Administrator Anthem Blue Cross and Blue Shield and DEF Insurance Company, Defendants,

CHARTER OAK FIRE INSURANCE COMPANY, Defendant-Respondent.

Court of Appeals

*No. 2014AP2990. Submitted on briefs June 12, 2015. —Decided October 15, 2015.*

2015 WI App 89

(Also reported in 872 N.W.2d 109.)

530

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Christopher E. Rogers* and *Susan R. Tyndall* of *Habush Habush & Rottier, S.C.*, Madison.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Stacy Broman* of *Meagher & Geer, P.L.L.P.*, Minneapolis, Minnesota.

Before Kloppenburg, P.J., Sherman, and Blanchard, JJ.

¶ 1. BLANCHARD, J. Patrick Connors alleges that a foundry where he had been employed negligently allowed bacteria to be dispersed or released into the air, that he inhaled some of these bacteria while visiting the foundry, and that this resulted in illness causing bodily injury. Connors filed this direct action against the foundry's insurer. The circuit court granted summary judgment to the insurer after concluding that a pollution exclusion provision contained in the foundry's insurance policy bars coverage for Connors' alleged injuries. The court concluded that the bacteria allegedly dispersed or released by the foundry and inhaled by Connors were "contaminants," which are defined to be "pollutants" under the pollution exclusion.

531

¶ 2. We conclude that the pollution exclusion in the foundry's policy, which is considerably more detailed than the standard pollution exclusion in many commercial general liability policies, is ambiguous on the question of whether the bacteria are "pollutants" in the context of the occurrence alleged here. The exclusion is ambiguous in this context because the bacteria are not obviously in the nature of the commercial or industrial products or byproducts specified in the pollution exclusion, and therefore a reasonable insured could expect coverage. Accordingly, we reverse the summary judgment and remand for further proceedings.[1]

## BACKGROUND

¶ 3. In the operative complaint, Connors makes allegations that include the following. Connors had been an employee of Grede Foundries of Reedsburg, Wisconsin, and hoped to return to work there, when he became ill and was diagnosed with pneumonia caused by exposure to the bacteria *Legionella pneumophila*.[2]

---

[1] Our rationale and conclusion are consistent with another opinion that we also release today that is in the same procedural posture and involves closely matching facts. *See Ramos v. The Charter Oak Fire Ins. Co.*, 2014AP2039, slip op. (WI App Oct. 15, 2015).

[2] The following is a general but partial definition of bacteria: "microscopic plants" "that are often aggregated into colonies," "living in soil, water, organic matter or the live bodies of plants and animals, and . . . important to man because of their chemical effects (as in nitrogen fixation, putrefaction, and various fermentations) and as pathogens." *Bacteria,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993). It is not disputed that scientists call the bacteria at issue here "*Legionella pneumophila.*" As explained in undisputed authorities quoted in summary judgment materials, *Legionella pneumophila*

An investigation by a federal agency showed that water in the foundry cooling towers contained *Legionella pneumophila*. These towers were "in proximity" to "fresh air intakes" at the foundry. During the pertinent time period, the foundry had a liability insurance policy with Charter Oak Fire Insurance Company.[3]

¶ 4. As pertinent here, the complaint alleges that the foundry "was negligent in not properly maintaining its cooling towers, and other water sources," which "allowed for the growth of *legionella pneumophila*" and Connors' exposure to the bacteria, which resulted in bodily injury to him.

¶ 5. Those are the limited factual allegations in the complaint. However, the parties do not dispute that the following additional facts apply to Connors' allegations:

> Legionnaire[s'] disease is a type of pneumonia caused by the *Legionella* bacteria. The bacteria grow best in warm water, like the kind found in hot tubs, cooling towers, hot water tanks, large plumbing systems, or parts of air-conditioning systems of large buildings. Legionnaire[s'] disease is contracted by breathing in [water] mist or vapor that has been contaminated with *Legionella* bacteria.

*See Heinecke v. Aurora Healthcare, Inc.*, 2013 WI App 133, ¶ 2, 351 Wis. 2d 463, 841 N.W.2d 52. As is

were causative agents in the 1976 pneumonia outbreak at an American Legion Convention in Philadelphia, the infamous incident behind the bacteria's name. Following the parties and authorities on which both parties rely, we use the terms "*Legionella* bacteria" or "the bacteria."

[3] In addition to Charter Oak, the complaint names another insurance company that was later dismissed from the case in a decision not now appealed by Connors. The complaint also names a health plan for the foundry and its third-party administrator, about which no issue is raised on appeal.

commonly understood, pneumonia is an infection with potentially serious health effects that inflames air sacs in the lungs. *See* http://www.mayoclinic.org/diseases-conditions/pneumonia/basics/definition/con-20020032 (last visited Oct. 13, 2015).

¶ 6. The only issue on appeal is whether the pollution exclusion in the foundry's Charter Oak policy applies in the context of an occurrence of the type alleged here. We now address pertinent policy terms.

¶ 7. Under the pollution exclusion, "insurance does not apply to" bodily injuries caused by "pollutants" that have been dispersed or released from a location owned by the insured, here the foundry. More specifically, the policy excludes coverage for "[b]odily injury" "arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants,' " "[a]t or from any premises, site or location which is or was at any time owned or occupied by . . . any insured."

¶ 8. "Pollutants" are initially defined in the pollution exclusion to mean "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." "Waste includes materials to be recycled, reconditioned or reclaimed."

¶ 9. Up to this point in our summary, the Charter Oak policy pollution exclusion is identical to pertinent language contained in the standard commercial general liability pollution exclusion, which we will refer to as "the standard pollution exclusion."

¶ 10. However, an endorsement to the policy, entitled "Indiana Changes—Definition of Pollutants," replaces the definition of "pollutants" in the standard pollution exclusion with a different, more specific, definition. We will refer to this as "the endorsement."

Charter Oak does not dispute that the endorsement changes the definition of "pollutants" in the policy here. Therefore, consistent with discussion by the parties, when we refer to "the pollution exclusion" at issue here we are referring to the exclusion as modified by the definition of "pollutants" contained in the endorsement.

¶ 11. The endorsement begins with the same language from the standard pollution exclusion defining "pollutants" to mean "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." However, the endorsement, but not the standard pollution exclusion, then lists four categories of examples of substances that are defined to be pollutants:

"Pollutants" includes:

a. Petroleum or petroleum derivatives, gasoline, fuels, lubricants, and their respective additives and individual chemical components, including benzene and toluene;

b. Chlorinated and halogenated solvents, including tetrachloroethylene (PCE or PERC), trichloroethylene (TCE), trichloroethane (TCA) and vinyl chloride, and their degradation products;

c. Coal tar, manufactured gas plant (MGP) byproducts and polynuclear aromatic hydrocarbons (PAHs), phenols and polychlorinated biphenyls (PCBs); and

d. Organic and inorganic pesticides, and inorganic contaminants, including arsenic, barium, beryllium, lead, cadmium, chromium and mercury.

We will refer to these four categories collectively as "the included substances categories."

535

¶ 12. The second set of provisions in the endorsement, but again not in the standard pollution exclusion, clarifies the definition of pollutants in the following respects:

This definition of "pollutants" applies regardless of whether:

1. The irritant or contaminant, or the particular form, type or source of the irritant or contaminant, involved in the claim or "suit" is specifically identified or described in this definition, such as waste from manufacturing operations;[4]

2. The irritant or contaminant has or had any function in any of the insured's business, operations, premises, sites or locations, such as:

 (i). PERC for a dry cleaning business; or

 (ii). TCE, or any of the other items included as examples of "pollutants" in **b.** above, for degreasing operations;

3. The irritant or contaminant represents a major source of potential liability for the insured, such as gasoline, or any of the other items included as examples of "pollutants" in **a.** above, for a gasoline station; or

4. The insured expects or considers the irritant or contaminant to be a pollutant.

Waste includes materials to be recycled, reconditioned or reclaimed.

¶ 13. Charter Oak moved the circuit court to dismiss Connors' complaint on the grounds that the pollution exclusion bars coverage, or, in the alternative

---

[4] We will call subsection (1.), which as we discuss below is emphasized by Charter Oak, the "specifically identified substances provision."

to bifurcate the proceedings to resolve the coverage issue before resolving liability, if necessary. The court granted Charter Oak's motion to bifurcate the proceedings.

¶ 14. Charter Oak followed this with a motion for summary judgment and supporting evidence, arguing in part that the evidence establishes beyond dispute that "*Legionella* bacteria are contaminants, and thus 'pollutants,' to which the pollution exclusion applies, barring coverage." This motion was accompanied by a report of Michael T. Osterholm, a medical school professor, addressing topics that include the prevalence of *Legionella* bacteria and the health hazard the bacteria pose when inhaled in mist or vapor.

¶ 15. Connors filed a brief in opposition to the motion for summary judgment, arguing in part that Charter Oak had failed to account for terms in the endorsement that diverge from the standard pollution exclusion, and that when all pertinent language is considered "a reasonable insured . . . would conclude that this particular pollution exclusion applies only to industrial or environmental pollution," not to bacteria in the occurrence alleged here.

¶ 16. The circuit court granted Charter Oak's motion for summary judgment, after concluding that the pollution exclusion here unambiguously bars coverage for Connors' alleged injuries, and on this basis dismissed the complaint. Connors appeals.

## DISCUSSION

¶ 17. The only issue presented on appeal is whether summary judgment should be granted to Charter Oak because it is undisputed that *Legionella* bacteria, in the context of the allegations here, are

"pollutants" under unambiguous terms of the pollution exclusion.[5] We conclude that summary judgment is not appropriate. While we rely on aspects of two recent Wisconsin Supreme Court decisions addressing an insurance policy pollution exclusion—*Wilson Mutual Insurance v. Falk*, 2014 WI 136, 360 Wis. 2d 67, 857 N.W.2d 156, and *Preisler v. General Casualty Insurance*, 2014 WI 135, 360 Wis. 2d 129, 857 N.W.2d 136—these opinions and other Wisconsin appellate cases are largely distinguishable because they interpret the standard pollution exclusion, not the pollution exclusion at issue here. We conclude that the pollution exclusion here is ambiguous, that is, susceptible to more than one interpretation by a reasonable insured, on the question of whether the bacteria Connors allegedly inhaled were "pollutants." Under at least one interpretation, a reasonable insured may expect coverage because the bacteria in this context are not obviously in the nature of the commercial or industrial products or byproducts specified as pollutants in the pollution exclusion.

## I. STANDARD OF REVIEW AND LEGAL STANDARDS

¶ 18. We review a grant of summary judgment independently of the circuit court, applying the same methodology, based on the standards in WIS. STAT.

---

[5] We do not reach a separate threshold question in interpreting the pollution exclusion, namely, whether there is evidence that could support a finding that the purported pollutant was dispersed or released from the foundry at the pertinent time, because we conclude that the bacteria are not "pollutants" under the exclusion.

§ 802.08 (2013–14).[6] *Preisler*, 360 Wis. 2d 129, ¶ 16. Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." § 802.08(2).

¶ 19. The following standards guide insurance policy interpretation:

> Our goal in interpreting an insurance policy is to ascertain and carry out the parties' intentions. "To that end, we interpret policy language according to its plain and ordinary meaning as understood by a reasonable person in the position of the insured."
>
> Terms or phrases in an insurance contract are ambiguous only "if they are fairly susceptible to more than one reasonable interpretation." If policy language is ambiguous, the contract will be narrowly construed against the insurer as its drafter. However, an ambiguity exists only where a policy is subject to more than one reasonable interpretation . . . .
>
> Absent a finding of ambiguity, this court will not apply the rules of construction to rewrite the language of an insurance policy to bind an insurer to a risk which it did not contemplate and for which it did not receive a premium. As such, an insurance policy's pollution exclusion clause is ambiguous if a reasonable insured could expect coverage.

*Wilson Mutual*, 360 Wis. 2d 67, ¶¶ 23–25 (citations omitted).

---

[6] All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

¶ 20. Courts follow three steps in determining whether insurance coverage exists: (1) examine the allegations in the complaint to determine whether the policy makes an initial grant of coverage for the claim made in the complaint; (2) if the claim triggers a potential grant of coverage, examine whether a policy exclusion precludes coverage for that claim; and (3) if an exclusion precludes coverage, consider whether any exception to the exclusion reinstates coverage. *Preisler*, 360 Wis. 2d 129, ¶ 22.

¶ 21. The first and third steps of coverage analysis are not in dispute. As to the first step, there is no dispute about whether the policy provides an initial grant of coverage, which arose when Connors allegedly suffered "bodily injury" caused by an "occurrence." Under the policy terms, "occurrence" "means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." As to the third step, neither party directs us to an exception that could restore coverage if the pollution exclusion applies.

¶ 22. The dispute involves the second step of coverage analysis, whether the *Legionella* bacteria were "unambiguously" pollutants "within the policy's definition" at the time of the "occurrence," and are thereby excluded from coverage. *See Wilson Mutual*, 360 Wis. 2d 67, ¶¶ 34, 38. This question "is evaluated from the standpoint of a reasonable insured." *See id* ., ¶ 38.

## II. THE VIEW OF A REASONABLE INSURED

¶ 23. We first address the suggestion by Charter Oak that we should interpret the pollution exclusion here by following the interpretations of the standard

540

pollution exclusion contained in such cases as *Wilson Mutual. See id.*, ¶¶ 37–38. After explaining why we consider these cases to be distinguishable, we turn to the alternative argument by Charter Oak that, in the view of a reasonable insured, the term "pollutants" in the pollution exclusion unambiguously includes bacteria in the context of an occurrence of the type alleged here.

## A. *Wilson Mutual* and Related Case Law Interpreting the Standard Pollution Exclusion.

¶ 24. Charter Oak argues that this court should not "abandon" the "well-developed framework that analyzes whether a substance is a pollutant by determining if it is 'universally present and generally harmless.' " This is a reference to a body of case law culminating in *Wilson Mutual* and *Preisler*.

¶ 25. The court in *Wilson Mutual* held that the standard pollution exclusion unambiguously excluded coverage for a claim that liquid cow manure fouled well water after the manure was spread on farm fields as fertilizer, because the manure constituted a pollutant in this context. *Wilson Mutual*, 360 Wis. 2d 67. In a similar vein, in *Preisler* the court held that the standard pollution exclusion unambiguously excluded coverage for a claim that decomposing septage fouled well water after the septage was spread on farm fields as fertilizer, because the septage constituted a pollutant in this context. *Preisler*, 360 Wis. 2d 129.

¶ 26. Both *Wilson Mutual* and *Preisler* considered a series of prior court interpretations of the term "pollutants" contained in the standard pollution exclusion and applied them to the respective substances at issue within the context of the respective occurrences

alleged. The court in *Wilson Mutual* boiled down the interpretation of "pollutants" in the standard pollution exclusion to the following two-part test:

> [A] reasonable insured would consider a substance to be a pollutant if (1) the substance is largely undesirable and not universally present in the context of the occurrence that the insured seeks coverage for; and (2) a reasonable insured would consider the substance causing the harm involved in the occurrence to be a pollutant.

*See Wilson Mutual*, 360 Wis. 2d 67, ¶ 38.[7]

¶ 27. The problem with Charter Oak's approach in this appeal is that the *Wilson Mutual* test is explicitly based on the interpretation of significantly different policy language than is at issue here.[8] The court

---

[7] Instead of explicitly applying this two-part test, the court in *Preisler v. General Casualty Insurance*, 2014 WI 135, ¶¶ 45–47, 360 Wis. 2d 129, 857 N.W.2d 136, used a closely similar approach, but spoke in terms of two "limiting principles": (1) whether the substance is "universally present and generally harmless in all but the most unusual instances," *id.* (quoting *Donaldson v. Urban Land Interests, Inc.*, 211 Wis. 2d 224, 234, 564 N.W.2d 728 (1997)) and (2) whether harm from the substance results from "everyday activities gone slightly, but not surprisingly, awry." *Id.* (quoting *Pipefitters Welfare Education Fund v. Westchester Fire Insurance*, 976 F.2d 1037, 1044 (7th Cir. 1992)). For the sake of simplicity, we primarily apply the *Wilson Mutual* test.

[8] The court in *Wilson Mutual* explained the policy language at issue:

> Like many commercial and non-commercial insurance policies, the Wilson Mutual policy's General Farm Liability Coverage had a pollution exclusion [that] excludes from coverage any "bodily injury" or "property damage" which results from the "actual, alleged or threatened discharge, dispersal, seepage, migration, release, or escape of 'pollutants' into or upon land, water, or air." The policy defines pollutants as "any solid, liquid, gaseous,

was not presented with the language used in the endorsement here, nor did it address hypotheticals or theories involving such language.

¶ 28. Charter Oak appears to suggest that all that matters is the language that overlaps between the standard pollution exclusion and the pollution exclusion here. However, each insurance contract must be construed on its own terms. *See Acuity v. Chartis Specialty Ins.*, 2015 WI 28, ¶ 98, 361 Wis. 2d 396, 861 N.W.2d 533 ("Slightly different [insurance policy] language can have slightly different meanings."). Courts are to "interpret policy terms not in isolation, but rather in the context of the policy as a whole." *Day v. Allstate Indem. Co.*, 2011 WI 24, ¶ 28, 332 Wis. 2d 571, 798 N.W.2d 199; *see also Blum v. 1st Auto & Cas. Ins.*, 2010 WI 78, ¶ 20, 326 Wis. 2d 729, 786 N.W.2d 78 (like other contracts, insurance policies "are to be read as a whole" and "a single clause or sentence" may not "capture the essence of an insurance agreement."). Moreover, consistent with the rule that we interpret

---

thermal, or radioactive irritant or contaminant, including acids, alkalis, chemicals, fumes, smoke, soot, vapor, and waste. Waste includes materials to be recycled, reclaimed, or reconditioned, as well as disposed of."

*Wilson Mut. Ins. v. Falk*, 2014 WI 136, ¶ 37, 360 Wis. 2d 67, 857 N.W.2d 156; *see also Preisler*, 360 Wis. 2d 129, ¶¶ 4, 13 (reviewing "a pollution exclusion clause commonly found in commercial general liability (CGL) policies" that excludes from coverage "harm 'arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" . . . .' " and defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.").

insurance policy language from the viewpoint of a reasonable insured, courts avoid interpreting policy language as though it adds nothing, as if it were "mere surplusage." *See Marks v. Houston Cas. Co.*, 2015 WI App 44, ¶ 26, 363 Wis. 2d 505, 866 N.W.2d 393, *review granted* (September 15, 2015).

¶ 29. The endorsement provides a significantly different definition of "pollutants" that cannot be treated as surplusage. Indeed, as discussed below, the additional language provides a new definition of pollutants, under which it is ambiguous whether the bacteria alleged to have been inhaled are obviously in the nature of the commercial or industrial products or byproducts specified in the pollution exclusion. For this reason, we reject Charter Oak's repeated assertion that the standard pollution exclusion is "identical" to the pollution exclusion here, and that we should therefore apply the *Wilson Mutual* test to the different policy language here, without regard for the more detailed definition in the endorsement.

¶ 30. We reject on similar grounds three related arguments that Charter Oak makes, based on Wisconsin appellate court precedent.[9] The first is that "the word contaminant unambiguously includes bacteria" under *Landshire Fast Foods of Milwaukee, Inc. v. Employers Mutual Casualty Co.*, 2004 WI App 29, 269 Wis. 2d 775, 676 N.W.2d 528. In *Landshire*, this court interpreted the standard pollution exclusion to preclude coverage when the bacteria *Listeria monocytogenes* allegedly rendered food products unfit for con-

---

[9] We do not address persuasive authority from other jurisdictions cited by Charter Oak, because as we understand Charter Oak's position these cases would merely provide potential guidance in interpreting the standard pollution exclusion, not in interpreting the endorsement language.

544

sumption. *Id.*, ¶ 17. The second related argument is that, as quoted above, this court in *Heinecke*, 351 Wis. 2d 463, ¶ 2, spoke in terms of *Legionella* bacteria "*contaminat[ing]*" water mist or vapor, and, according to Charter Oak, this use of a variation on the word contaminant to refer to the bacteria "is just the plain and ordinary way anyone would describe *legionella* bacteria's effect on the air." These arguments based on *Landshire* or *Heinecke* have no place in this appeal because there was no discussion in either case addressing the endorsement language, and we had no occasion in either opinion to contemplate such language.

¶ 31. We also note that, even when one interprets the standard pollution exclusion, *Wilson Mutual* rejected a categorical approach, under which for example all bacteria in all contexts, or even all *Legionella* bacteria, are "pollutants." *See Wilson Mutual*, 360 Wis. 2d 67, ¶¶ 39–43 (in interpreting the pertinent policy language, court places emphasis on the context of the type of occurrence at issue, without regard to whether the substance might be a "pollutant" in other contexts). Reading *Landshire* or *Heinecke* as adopting such a categorical approach would conflict with the rationales shared by *Wilson Mutual* and *Preisler*.

¶ 32. For essentially the same reasons, we reject Charter Oak's third related argument. Charter Oak apparently invites us to conclude that *Wilson Mutual* and *Preisler* stand for the broad proposition that all "organic substances" alleged to have caused a bodily injury "satisfy the definition of a pollutant" in any pollution exclusion provision in any insurance policy. Again, such a broad argument, if intended, would fail to account for the endorsement language, and would be inconsistent with *Wilson Mutual*'s directive to analyze

at least the standard pollution exclusion within the context of the type of occurrence at issue.

¶ 33. For these reasons, we reject the argument by Charter Oak that we should interpret the pollution exclusion here by following prior case law interpretations of the standard pollution exclusion. This conclusion disposes of extensive arguments that Charter Oak makes on appeal, because Charter Oak repeatedly relies on case law interpreting the standard pollution exclusion.[10]

**B. Pollution Exclusion Policy Language Here**

¶ 34. Turning to the pertinent policy language in this case, we now explain why we conclude that the pollution exclusion language here is ambiguous on the question of whether the bacteria are "pollutants" in the context of the alleged occurrence, and why we reject specific contrary arguments that Charter Oak makes. We begin with the initial terms of the pollution exclu-

---

[10] Our conclusion that cases interpreting the standard pollution exclusion are generally distinguishable does not rely on whatever Connors intends to argue about what Connors calls "Indiana-specific language," based on aspects of Indiana law that allegedly gave rise to the language in the endorsement. Connors contends that "Indiana law sheds light on interpretation" of the endorsement. However, we agree with Charter Oak that this case involves a policy that we interpret under Wisconsin law alone. Neither party draws our attention to language in the policy that refers even indirectly to legislation or case law originating in Indiana, aside from the unexplained reference to Indiana in the endorsement heading, "Indiana Changes—Definition of Pollutants." On a related note, neither party suggests that the endorsement applies only to claims that arise in, or have some other nexus to, Indiana.

sion, which as explained above match the terms of the standard pollution exclusion.

### 1. The Initial Terms of the Pollution Exclusion

¶ 35. We agree with Charter Oak to the extent that it suggests that, if we were presented only with the language in the standard pollution exclusion, then coverage would be excluded, given the evidence submitted on summary judgment. It is undisputed that *Legionella* bacteria in aerosolized water droplets would have been pollutants under the standard pollution exclusion at the time the bacteria allegedly infected Connors, because there is no dispute that: (1) it is uncommon for people to inhale *Legionella* bacteria in aerosolized water droplets and when these bacteria are inhaled they pose a health hazard; and (2) a reasonable insured would view these mist- or vapor-borne bacteria as pollutants. That is, applying the two-part test in *Wilson Mutual* for the standard pollution exclusion, a reasonable insured would consider the bacteria to be "largely undesirable and not universally present," and that it is a pollutant in this context. *See Wilson Mutual*, 360 Wis. 2d 67, ¶ 38.

¶ 36. There is no question that *Legionella* bacteria are "largely undesirable" when considered in the context of the occurrence alleged here.[11] "[A] substance is a contaminant," and therefore a "pollutant" under

---

[11] We note that, seemingly by definition, any substance that is alleged to have caused bodily injury in a particular context is "largely undesirable" in that context. This appears to have been among the reasons that the dissenting justice in *Wilson Mutual* concluded that the two-part test stated by the majority allows the pollution exclusion to reduce "the contractual promise of coverage" "to a dead letter." *Wilson Mutual*, 360 Wis. 2d 67, ¶ 110 (quoting *Donaldson*, 211 Wis. 2d at 233).

the standard pollution exclusion, "if it 'make[s] [something] impure or unclean by contact or mixture.' " *Id.*, ¶ 48. Further, undesirability in this context includes the concept of harmfulness. *See id* ., ¶ 39. Connors inaccurately asserts, contrary to the only evidence submitted on summary judgment, that "the undisputed evidence is that *Legionella* is harmless in almost all circumstances." Connors presented no expert testimony, and Osterholm's testimony establishes that *Legionella* bacteria are largely harmful when inhaled in dispersed or released water mist or vapor. *See id.*, ¶ 49 ("manure safely applied on a field" may be considered desirable, but "a reasonable insured would consider manure *in a well* to be a pollutant").[12]

However, our obligation is to apply the holding of the court, and we make no further references to this "dead letter" objection.

[12] Our conclusion on this point assumes that a reasonable insured has access to undisputed facts based on current scientific knowledge. Consistent with the direction in *Wilson Mutual* cited above that we are to consider "the parties' objectively reasonable expectations" in interpreting the policies, we understand that the test embraces the expectations of a reasonable insured who is aware of the objective, uncontested facts regarding the prevalence of *Legionella* bacteria and their causative role in Legionnaires' disease. *See Wilson Mutual*, 360 Wis. 2d 67, ¶ 24. The average insured presumably is not familiar with the details of how nitrates, particular strains of *Escherichia coli,* or other types of bacteria can contaminate well water when manure mixes with the water, but that lack of detailed scientific knowledge did not matter to the court's analysis in *Wilson Mutual. See id.*, ¶¶ 6, 46–52. Both manure and bacteria are widely understood to be potentially hazardous substances, depending on the context in which they appear, and an insured's "objectively reasonable expectations" about the particular hazards involved can include objective, uncontested facts regarding those hazards for purposes of applying unambiguous insurance policy terms.

¶ 37. As to the question of whether *Legionella* bacteria are "universally present in the context of the occurrence" here, the key is whether the Legionella bacteria are present, in any concentration, in the air, which is what would matter under the standard pollution exclusion. Connors does not argue, and could not credibly argue, that *Legionella* bacteria are "universally present" in the air that people typically inhale. To the contrary, the unrebutted evidence submitted on summary judgment is that *Legionella* bacteria are rarely present, in any concentration, in the air.

¶ 38. Connors argues that these "airborne" bacteria "remain[] waterborne," because the bacteria are suspended in water mist or vapor when they are allegedly inhaled, and therefore the question is how prevalent they are in water sources, not how prevalent they are in the air people inhale. However, we are to focus on the occurrence at issue, which involves the inhalation of aerosolized bacteria while they are in air, not consumption of the bacteria while they are in bodies or vessels of water, such as when drinking, swimming, or bathing.[13] Our conclusion is consistent

---

[13] We reject Connors' argument based on persuasive authority that the standard pollution exclusion, if it applied here, would not bar coverage. Wisconsin cases interpreting the standard pollution exclusion such as *Wilson Mutual* and *Landshire Fast Foods of Milwaukee, Inc. v. Employers Mutual Casualty Co.*, 2004 WI App 29, 269 Wis. 2d 775, 676 N.W.2d 528, foreclose Connors' argument regarding the terms of the standard pollution exclusion based in part on persuasive authority that includes *Keggi v. Northbrook Property & Casualty Insurance*, 13 P.3d 785 (Ariz. App. Div. 2000). In *Keggi*, the Arizona appellate court interpreted the standard pollution exclusion in the context of alleged injuries arising from drinking water containing bacteria and concluded that: (1) "waterborne bacteria," as "*living, organic* irritants or contaminants,"

549

with the general, partial definition of bacteria quoted in footnote 2, *supra*: "living in soil, water, organic matter or the live bodies of plants and animals," with no reference to bacteria in mist, vapor, or the air generally. *See Bacteria,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993).

¶ 39. Finally, based on these same factors, it is evident that a reasonable insured, who knows the undisputed facts about these bacteria, would view them as contaminants when inhaled as alleged here.

## 2. Specific Replacement Terms of the Pollution Exclusion

¶ 40. While there would be no coverage if the policy here included the standard pollution exclusion language only, we now explain why the specific, detailed endorsement language makes the difference. We address each set of provisions and explain why we conclude that the pollution exclusion here is ambiguous on the question of whether mist- or vapor-borne "bacteria" fits into any category or type of pollutants referred to in the endorsement. Ambiguity arises because the replacement definition of "pollutants" in the

"do not fit neatly within" the terms " 'solid,' 'liquid,' 'gaseous' or 'thermal' "; (2) " 'smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste' are primarily inorganic in nature," while bacteria, "as living organisms, are not similar to the exclusion's enumerated list"; and (3) " 'waste' . . . refers to industrial byproducts, rather than to the organic matter which might have caused the contamination of the water." *Id* ., ¶¶ 16–18. The substances at issue in *Wilson Mutual* and *Landshire*— respectively, manure and bacteria *Listeria monocytogenes*— were organic, in the sense that they included living organisms, but the courts in those cases nonetheless concluded that the substances were contaminants under the standard pollution exclusion.

endorsement limits the exclusion by specifying particular types of substances that qualify as pollutants.

¶ 41. **The Included Substances Categories.** As the full quotation of the text above shows, the endorsement lists four categories of substances that are "include[d]" as "pollutants." Summarizing, category a. consists of petroleum fuels and lubricants and their additives, category b. consists of chlorinated and halogenated solvents and their byproducts, category c. consists of coal tar and the byproducts of manufactured gas, and category d. consists of all pesticides and "inorganic contaminants," including seven identified inorganic chemical metals.

¶ 42. We would be on our own in attempting to assign precise meanings to the terms used in the included substances categories, because neither party directs us to commonly accepted or objectively undisputed definitions of any of these terms. To cite only one example, the record provides no guidance, and the parties make no attempt to explain, what a reasonable insured might think a "degradation product" of trichloroethylene is, even an insured with access to objectively undisputed evidence on pertinent topics. We are nonetheless obligated to interpret how the included substances categories would be understood by a reasonable insured, bearing in mind Charter Oak's burden of showing that the exclusion applies. *See Day*, 332 Wis. 2d 571, ¶ 26 (insurer bears the burden of showing that exclusion precludes coverage if the insured carries initial burden of showing an initial grant of coverage).

¶ 43. Without assigning detailed meanings to each term, it is readily apparent that each category involves a type of product or byproduct that would be expected to be used in, or result from the operation of, particular types of commercial or industrial opera-

tions: petroleum-based fuels; lubricants; solvents; "manufactured gas plant . . . byproducts;" pesticides; and inorganic chemical metals. As Connors argues, every item specified in the included substances categories appears to be an expected commercial or industrial product or byproduct of particular kinds of business operations. It is true that none of the included substances categories explicitly excludes mist- or vapor-borne bacteria. However, we see no reason to conclude that a reasonable insured reading any category would think of mist- or vapor-borne bacteria as belonging in any of the four categories. Thus, reading the categories as a group only reinforces this view.

¶ 44. We do not mean to suggest that aerosolized *Legionella* bacteria could not possibly be considered byproducts of certain kinds of commercial or industrial operations. We also question Connors' broad assertions that the pollution exclusion does not apply because the bacteria here could not be considered "industrial pollutants," and that each category describes an "industrial chemical." Instead, to repeat, we look at the substances specified in each of the four included substances categories and conclude that there is ambiguity as to whether the bacteria alleged to have infected Connors fit into any of the four categories, or whether the bacteria are suggested by the collective meaning of the four categories.

¶ 45. Weighing in one direction are facts that include the following: no category explicitly states that bacteria cannot be a pollutant; "organic pesticides" might possibly include bacteria, at least as a component of a pesticide; and terms such as "derivatives," "additives," "chemical components," and "degradation products" are sweeping in themselves, which at least in theory could point in the direction of microbial

552

pathogens. Weighing in the other direction are facts that include the following: neither bacteria generally nor mist-or vapor-borne bacteria in particular are specified, and arguably they are not alluded to, in any category; category d. specifies both "organic and inorganic pesticides," but includes only "*inorganic* contaminants"; and, as to "organic pesticides," aerosolized *Legionella* bacteria are not readily identifiable as a pesticide.

¶ 46. Charter Oak effectively concedes Connors' contention that the endorsement's list of numerous commercial and industrial products and byproducts limits the reach of the pollution exclusion as we have characterized it, because Charter Oak fails even to attempt to give meaning to the terms contained in the included substances categories in a way that would clearly place mist- or vapor-borne bacteria in any of the included substances categories. That is, Charter Oak gives us no reason to read any category as reasonably including bacteria in general, or bacteria as a mist- or vapor-borne pathogen in particular, or to read the categories as a group as including bacteria. Charter Oak dismissively refers only in passing to the concept that the endorsement includes "several examples of substances," leaving us in the dark as to how Charter Oak believes any term used in the categories should be reasonably understood. Charter Oak merely asserts that it is "irrelevant whether *legionella* bacteria are 'industrial-type pollutants,' " given the *Wilson Mutual* test, which as we have explained does not apply here.

¶ 47. **The Specifically Identified Substances Provision**. We now turn to the second set of provisions that are contained in the endorsement definition but not in the standard pollution exclusion. As set forth above, the first provision in this second set states that

the foregoing definition of pollutants "applies regardless of whether" the "irritant or contaminant, or the particular form, type or source of the irritant or contaminant, involved in the claim or 'suit' is specifically identified or described in this definition, such as waste from manufacturing operations." As stated above, we call this the "specifically identified substances provision."

¶ 48. We conclude that the specifically identified substances provision is susceptible to more than one interpretation by a reasonable insured, and is therefore ambiguous. We first describe what we conclude is the more reasonable construction, then turn to what might be a second possible construction.

¶ 49. The more reasonable construction of the specifically identified substances provision would be to clarify that: (1) substances that are not specifically identified in one of the included substances categories may be irritants or contaminants, so long as they are similar in kind to substances that are listed in one of the included substances categories (*e.g.*, a petroleum-related substance that is not benzene or toluene may be a pollutant); but (2) entirely new *categories* of substances are not contemplated. This would be a logical clarification, consistent with the interpretive maxim *ejusdem generis*, in light of the fact that the included substances categories each use some mixture of broad definitions (*e.g.*, "petroleum derivatives," "inorganic contaminants") and specific identifications or descriptions (*e.g.*, "benzene," "arsenic"). *See State v. Popenhagen*, 2008 WI 55, ¶¶ 46–48, 309 Wis. 2d 601, 749 N.W.2d 611 (general word preceded or followed by related, specific words may be construed to embrace only items similar in nature to those enumerated).

554

¶ 50. Charter Oak argues that *ejusdem generis* can play no interpretative role here. However, Charter Oak bases this argument primarily on Wisconsin appellate court interpretations of the standard pollution exclusion. As we have explained, this argument is off topic because the pollution exclusion here is different.

¶ 51. We observe that the final phrase in the specifically identified substances provision—"such as waste from manufacturing operations"—supports our conclusion that one reasonable meaning of the provision is that, in order to be categorized as a pollutant, a substance must be similar in kind to substances listed in the included substances categories. Given the substances specified in the included substances categories, it signals an apparent *ejusdem generis* intent to single out "waste from manufacturing operations" as the only example. And, "waste from manufacturing operations" is not a phrase that unambiguously includes bacteria dispersed or released in mist or vapor from cooling towers.

¶ 52. In addition, this first reasonable interpretation would give meaning to the next two provisions in the second set of endorsement provisions, which we address below in ¶ 54. Read together, these two provisions suggest that the types of pollutants at issue are limited to substances of a type that fall within the included substances categories.

¶ 53. Charter Oak appears to rely on a second possible construction of the specifically identified substances provision, namely, that this provision nullifies any limiting effect of the included substances categories. Under this interpretation, all that matters is whether a substance is a pollutant under the broad definition found in the standard pollution exclusion (*i.e.,* the first part of the pollution exclusion here). At

least that is what we take Charter Oak to mean when it argues that the specifically identified substances provision "informs the insured that substances other than those specifically identified will be considered pollutants if they fall within the policy's definition of pollutants." While this may be one possible interpretation, it is the less reasonable one, because it would appear to treat the included substances categories as mere surplusage. That is, this potential interpretation would give a strong meaning to the phrase "regardless of whether [the pollutant] is specifically identified or described," but no meaning whatsoever to the included substances categories.

¶ 54. **The Function-In-Business and Major-Source-of-Liability Provisions**. We now consider together the next two provisions in the second set in the endorsement. These provide that the foregoing definition of pollutants "applies regardless of whether" (1) "[t]he irritant or contaminant has or had any function in any of the insured's business, operations, premises, sites or locations, such as . . . PERC for a dry cleaning business; or . . . TCE, or any of the other items included as examples of 'pollutants' in **b.** above, for degreasing operations;" or, (2) "[t]he irritant or contaminant represents a major source of potential liability for the insured, such as gasoline, or any of the other items included as examples of 'pollutants' in **a.** above, for a gasoline station." Because these two provisions repeat detailed references to commercial or industrial byproducts, they reinforce an interpretation of the included substances categories under which it refers to the products or byproducts that might be expected to be used in, or result from the operation of, certain commercial or industrial operations.

¶ 55. **Insured's Expectation Provision.** This brings us to the provision in the second set of endorsement provisions that states that the foregoing definition of pollutants "applies regardless of whether" "[t]he insured expects or considers the irritant or contaminant to be a pollutant." We are puzzled by this provision. On its face, this prevents consideration of the insured's reasonable understanding of what substances qualify as "pollutants" under the pollution exclusion, seemingly in direct conflict with a firmly established rule that we state above, which has also been stated in the following terms:

> We must give the words used in the policy their common and ordinary meaning, which is "what the reasonable person in the position of the insured would have understood the words to mean." Arnold P. Anderson, Wisconsin Insurance Law § 1.1(C) (4th ed.1998) (citations omitted); *see also State Farm Mut. Auto. Ins. Co. v. Langridge*, 2004 WI 113, ¶ 14, 275 Wis. 2d 35, 683 N.W.2d 75.

*Bethke v. Auto-Owners Ins. Co.*, 2013 WI 16, ¶ 20, 345 Wis. 2d 533, 825 N.W.2d 482. We consider this provision to be at least ambiguous, and apparently contrary to established Wisconsin law, and on this basis reject Charter Oak's unsupported assertion that this provision supports Charter Oak's argument that the pollution exclusion applies here.

¶ 56. Charter Oak asserts that it is "key" that "both the policy and the endorsement begin with the same language, defining 'pollutants' as 'any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemical and waste." Charter Oak does not develop this assertion into an argument. In any case, we fail to see how it adds anything to Charter Oak's other

arguments that this language is used to begin the definition or that it is found in both the body of the policy and the endorsement. As we have explained, the definition in the endorsement begins with broad language that is then significantly modified, notably through the included substances categories.

¶ 57. In sum, while coverage would not be available if the policy here contained the standard pollution exclusion, one reasonable interpretation of the included substances categories is that they involve products or byproducts that would be expected to be used in, or result from the operation of, certain commercial or industrial operations, and that would not include mist- or vapor-borne bacteria. We conclude that the specifically identified substances provision is susceptible to more than one interpretation by a reasonable insured, and therefore is ambiguous. The only other provisions that are not ambiguous appear to support this interpretation. Therefore, we conclude that the pollution exclusion is ambiguous on the question of whether the bacteria are "pollutants" in the context of the alleged occurrence. *See Peace v. Northwestern Nat'l Ins.*, 228 Wis. 2d 106, 121, 596 N.W.2d 429 (1999) (ambiguous terms in exclusion clauses are narrowly construed against the insurer because the insurer is better situated to eliminate ambiguity).

## CONCLUSION

¶ 58. For these reasons, we reverse the summary judgment and remand for further proceedings consistent with this opinion.

*By the Court.*—Judgment reversed and cause remanded for further proceedings.